STATE

v.

Enid DIAZ.

No. 93–676–C.A.

Supreme Court of Rhode Island.

Feb. 20, 1995.

Jeffrey Pine, Atty. Gen., Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine Gibran, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of Enid Diaz (defendant) from judgments of conviction on two counts of first-degree murder. After a jury trial in Superior Court, the defendant was sentenced to two consecutive life sentences. On appeal the defendant argued that the evidence presented by the state was legally insufficient to sustain first-degree murder verdicts and that a statement she gave to police falsely implicating others as the killers should have been suppressed as the product of an illegal detention. We affirm the judgments for the reasons stated below. The facts insofar as pertinent to this appeal follow.

## FACTS AND PROCEDURAL HISTORY

Israel Sajche (Israel) owned a three-story building at 112 Eastwood Avenue in Providence, Rhode Island, and shared its first floor with Rafael Melo–Pena (Melo) and Jorge Luna–Ayala (Luna). On the second floor of the building, Israel's brother, Eduardo Sajche (Eduardo) and Eduardo's wife Isabel Sajche (Isabel) lived with her four children. The third story was unoccupied. Isabel was the only adult female living in the building at the time.

On November 23, 1990, Israel, who worked a night shift, retired at approximately 5 p.m. while his two roommates chatted in the living room. Sometime later he was awakened by loud banging on the door of the apartment. As he tried to go back to sleep, he heard a man and a woman "arguing heatedly" inside the apartment. Although he did not recognize the voices, he testified that the man's voice was neither Melo's nor Luna's.

Immediately after the argument, however, Israel heard Melo clearly say in Spanish, "Por favor no hagas eso." ("Please don't do that.") Israel testified that in Guatemala and Mexico, the use of the verb "hagas" suggested that Melo was familiar with the person to whom he was speaking, although Israel also testified that Melo was Dominican, and usage of that verb form was more common there. Israel next heard three shots fired from within the apartment, then heard people leaving quickly through the rear door. He heard no cars leaving the area. Shortly after, he discovered Luna's body in the kitchen, blood streaming from his

head. Israel called his brother Eduardo on the phone and said, "Please phone the police. Someone has been killed—Jorge." Upon arrival, police also found that Melo was lying on the bed in his room with two gunshot wounds to his head. The time was approximately 7 p.m.

Isabel testified that sometime after 6 p.m. that evening, from the second floor, she heard three quick hammering noises, then a young woman's voice say "shut the door" in Spanish ("sierra la puerta"). She testified that the voice had come from "very near by [sic]" and sounded "strong," "like when someone is very scared." Isabel did not hear any cars leaving the area. Eduardo testified that he had heard "three bangs" at about 6:40 p.m. but had not heard any voices.

Francis Garrity, M. D., a forensic pathologist in the Rhode Island Medical Examiner's office established the cause of Luna's and Melo's deaths as gunshot wounds to the head. Melo's blood contained cocaine metabolites, and unmetabolized cocaine was found in his nasal passages and urine, apparently consistent with a moderate ingestion of cocaine by snorting on the previous evening.

Initially the police had no leads in the killings. Eventually, however, the police learned from Melo's sister that Melo on the day before his death, had told her that he was warned of a threat upon his life. According to his sister, Melo had had a Puerto Rican girlfriend whose Dominican husband or boyfriend was looking for Melo in order to kill him. Melo had met the girlfriend at the factory where he formerly worked.

On Monday, November 26, 1990, police proceeded to the factory where they learned that Melo apparently had a relationship with a woman known as Zoraida Salgado, who no longer worked at the factory. The police obtained a photocopy of Zoraida Salgado's Rhode Island identification card with an attached photograph and an address on Merino Street.

On Tuesday, November 27, while reviewing reports from the 24th and 25th of November, police found a report that a "nine millimeter automatic handgun" had been stolen from an apartment about four blocks from the murder scene. The police knew that a 9 millimeter automatic handgun was the weapon used in the two homicides, and noted the unusual coincidence that the telephone number of the person who had reported the gun stolen was the same as the number that had been written on a piece of paper, with no name next to it, found in Melo's bedroom. The name of the person who had made the report was not Zoraida Salgado, but Enid Diaz.

When the police officers went to the address where the handgun had been reported stolen, defendant answered the door. Although the police concluded that she was Zoraida Salgado from the employer's photograph, defendant introduced herself as Enid Diaz. The officers told her that they wanted to questions her about the stolen gun, and defendant invited them inside. The defendant told the officers that she had had a party on Saturday, November 17 and had noticed later that the gun had been stolen from her bedroom closet. While inquiring about the party, one of the officers mentioned the names of Jorge Luna and Rafael Melo. The defendant asserted that she knew neither person, even after an officer produced photographs of the two men. When pressed, however, defendant took Melo's photograph and said, "He kind of looks familiar. I may have met him when I was working."

The officers then asked that she accompany them to the police station to give a statement regarding the stolen gun. Besides a commitment to drive her home, the officers made no promises or threats to defendant, who voluntarily accompanied them to the station. During the trip to the station, the officers mentioned the name Zoraida Salgado; defendant responded that she had lived with a Zoraida Salgado on Merino Street.

At the station, defendant gave a formal statement at 12:15 p.m. on November 27, 1990, reiterating her story of how the gun was stolen, and adding that $125 in cash lying beside the gun was also taken. The defendant reviewed and signed the statement. No threats or promises had been made by the police. At the time of trial, the gun reported stolen by defendant had not been found.

After taking defendant's statement, the officer in charge of the investigation, Detective Frank Altomari (Altomari), asked her to wait for him, told her he would come right back, and went to confer with other officers. The defendant remained alone in the room for approximately one and one-half hours. Altomari testified that defendant was neither handcuffed nor under arrest.

At about 2:30 p.m., Altomari returned with a standard State of Rhode Island Rights form to the room where defendant waited. Altomari testified that at that point defendant was not in custody and was free to leave if she wished. The defendant filled out the form, which stated, "I, Enid A[.] Diaz, am a suspect in the crime(s) of murder (two)[.]" Altomari had defendant read to him the five rights printed on the form, asking after each whether she understood everything contained in the description of the rights. After she indicated that she did, Altomari asked her to place her initials next to each right. Altomari next asked defendant to read aloud to him the sentence immediately following the rights: "The police have made no threats or promises to me." She did so and initialed the sentence. Altomari asked defendant, "Do you understand your rights?" The defendant indicated that she did understand, and she signed the form.

Altomari then asked defendant whether she would agree to speak with police. When she agreed, Altomari questioned her for about two and one-half hours about the double murder at Eastwood Avenue. The witness statement that resulted was six pages long and was signed by defendant. In the statement, defendant said that her estranged husband, Edwin Diaz (Edwin), and his brother, Sixto Diaz (Sixto), had come to her apartment on Friday, November 23. Edwin had taken her gun and ordered her to bring him to Melo's home, ostensibly because Edwin was jealous of what he perceived was a relationship between Melo and defendant. The three drove to Melo's home where Edwin instructed defendant to knock on the door. She did so, and someone she did not recognize answered. When the Diaz brothers ran into the apartment, defendant stated that she panicked and ran home before she could witness what finally occurred.

During the course of questioning and again after she reviewed her statement, defendant requested that the Providence Police protect her from Edwin and Sixto. Because the police believed her story, they agreed. The police moved defendant and her children to a local Holiday Inn hotel room where an armed policewoman was stationed to protect defendant. The defendant appeared grateful and comfortable with this arrangement, and was considered a protected witness, not a potential defendant.

Altomari returned to the police station that night and prepared an affidavit for arrest warrants for Edwin and Sixto.

The next morning, Wednesday, November 28, 1990, Altomari, his partner, his superior officer, and defendant met with Assistant Attorney General Gerard Sullivan (Sullivan) to discuss long-term protection for defendant. She was not informed of her rights at this meeting because she was not, at that point, considered a suspect in a crime. Sullivan and defendant discussed her present and future living conditions, her continued protection, and her expected testimony before the grand jury. Sullivan also spoke with her concerning possible relocation sites safe from Edwin and Sixto.

At approximately 5:30 p.m. that evening, Altomari learned that the Diaz brothers had been apprehended by Connecticut authorities who knew Sixto and Edwin as dangerous men. Altomari immediately traveled to New Haven to speak with the brothers concerning the homicides.

The case was not to be so neatly resolved, however. Sixto, luckily it turned out, had been the victim of a car theft, and at the very date and time that defendant alleged Sixto was in Rhode Island about to kill Melo and Luna, Sixto actually was filling out a police statement in the Orange, Connecticut police station. Edwin also had an alibi for the time of the murders. Altomari called Providence, vacated the warrants, and returned to Providence just before 1 a.m., November 29.

Altomari had defendant awakened at the hotel and brought to the police department,

where she was told the Diaz brothers were in custody. The defendant seemed relieved, stating, "Thank God." However, when told that the Diaz brothers did not commit the crimes defendant became very quiet. When asked why she would implicate two innocent men in a double murder, defendant replied that it was her word against that of the Diaz brothers, and that the jury would believe her because she was a woman. The police continued to question her, initially without response. When defendant was shown morgue photographs of Melo and Luna and asked if she had cared for Melo, she stated that she had wanted to date him. When shown pictures of Luna's body and asked why he was killed, she replied, "He got in the way."

The defendant then stated that it was her boyfriend Juan Munoz (Munoz) who committed the murders and that his motive for the killings was jealousy. The nature of defendant's story remained the same as her earlier version, basically substituting Munoz for the Diaz brothers.

In her initial statement concerning the stolen gun, defendant had reported that when she had found the gun missing on Tuesday, November 20, she called D & L Guns (D & L), where she had purchased it, to obtain the serial number. When asked by Altomari why she had done this because she now claimed that the gun was not taken by Munoz until Friday morning, defendant said she had intended to sell the gun on the street and had phoned D & L to get the sales receipt to demonstrate the gun's worth to potential buyers. The serial number was reported to her as 245RN12686. The interview with the police concluded at 4 a.m.

Altomari testified at trial that he had advised defendant that she was free to leave at that point. The defendant replied that she did not want to return home but wanted to remain with the police.

Sullivan testified that even after discovering that defendant had been "lying wholesale" about the Diaz brothers' involvement, his office still considered her a protected witness. The police believed that she had lied to protect Munoz.

Later that day, defendant approached Detective Donna Carroll (Carroll), the policewoman assigned to protect her, and intimated that the murders were actually drug-related and that Melo had owed money to Munoz for drugs. She refused to speak further, however, until she had the opportunity to speak with Munoz.

That afternoon Sullivan visited defendant in her hotel room. The defendant repeated her account of the murder, adding that Munoz was not only jealous of Melo, but also that the two were involved in a drug dispute. She stated that she feared Munoz, with whom she had a pact that precluded her from making any further statements until she talked with him, under penalty of her family's death. After defendant admitted that her actions so far were designed to protect Munoz, Sullivan assured her that police would attempt to locate Munoz. Again, defendant requested that she remain in protective custody.

The focus of the investigation then shifted to Munoz. At 7:45 a.m. the following day, Friday, November 30, 1990, Altomari learned that Munoz had been located in New York City. The suspect, however, was dead, having committed suicide the night before. The Browning automatic weapon that Munoz had used to kill himself had a different serial number from the one defendant had reported stolen and which was believed to be the murder weapon. Later that afternoon, Sullivan and two police officials went to the hotel to speak with defendant. They informed her that Munoz had been located in New York but did not reveal his death. The police again asked for information about the murders and defendant again refused. Sullivan then informed defendant that officials were becoming more suspicious of her role in the murders.

Sullivan returned to the police station and instructed the police to inform defendant of Munoz's death. Sullivan further instructed that before taking any further statements from defendant, the officers should advise her of "her Miranda warnings." The defendant at that point was orally advised of her rights because, Sullivan testified, the tenor of the investigation had changed to an accusato-

ry one, and defendant may have believed at that point that she was no longer free to leave.

At the station, defendant reviewed a printed rights form with police, and Carroll took a statement from defendant at 4 p.m. At about 5 p.m. Friday, November 30, 1990, Sullivan decided to charge defendant with the murders.

In the second statement, again captioned "Witness Statement," defendant stated that Munoz had been a heroin dealer, and that Melo had sold drugs for him. The defendant acted as a courier between the two, leaving heroin in a cement block in front of Melo's apartment house while he left money there for her after picking up the heroin. Her story that she was not present at the killings remained consistent, though she stated that it was her gun, which she had reported stolen, that she saw in Munoz's possession when he burst into Melo and Luna's apartment.

Sullivan explained at trial that the factor that changed the focus of the investigation was that the weapon Munoz used to kill himself did not have the same serial number as the one defendant had reported stolen. According to Sullivan, had Munoz been found with the gun believed to be the murder weapon, "it would have been a different story."

That same day, other incriminating evidence concerning defendant emerged. Joseph Izzo (Izzo), the previous owner of the Browning 9 millimeter automatic handgun, had sold the weapon to D & L from whom defendant purchased it. After receiving a call from the police, Izzo brought spent shells from that gun to the police. At trial, the state's expert witness in firearm identification testified that to a reasonable degree of scientific certainty, five of the shells delivered to the police by Izzo matched the four shells which were taken from the kitchen and bedroom of the murder site. He further testified that test shells fired from Munoz's gun found in New York and the shells from the murder site had not been fired from the same gun.

In addition, a clerk at D & L testified that at 11 a.m. on Monday, November 19, 1990, he received a telephone call at the store from a female who identified herself as Enid Diaz. The woman told him that her Browning 9 millimeter automatic handgun had been stolen and that the Providence Police had instructed her to consult its place of purchase to obtain its serial number. After locating the serial number in his books and papers, the clerk telephoned the woman and read the serial number to her. At trial the clerk identified a purchase slip of a Browning firearm with the serial number 245RN12686, the same as the serial number on the weapon defendant later reported missing.

The defendant's brother testified that, in the past, defendant had carried a gun, and a Providence patrolman testified that on November 23, 1990, while investigating the murders, he had discovered a brown paper bag full of heroin in a cinder block under the front stairs of 112 Eastwood Avenue. Despite the fact that the area surrounding the bag was damp, the bag itself was dry, the patrolman testified.

At the conclusion of the state's case, defendant moved for an entry of a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. The trial justice denied the motion. The jury returned verdicts of guilty on both counts of first degree murder in the deaths of Melo and of Luna. The defendant's motion for a new trial pursuant to Rule 33, in which she argued that the state failed to produce sufficient proof of her guilt, was also denied. The defendant was sentenced to two consecutive life sentences. In response, defendant filed the instant appeal pursuant to G.L.1956 (1985 Reenactment) § 9–24–32.

## SUFFICIENCY OF THE EVIDENCE

█ In a criminal case, a challenge to the sufficiency of the evidence is properly made through a motion for judgment of acquittal. *State v. Henshaw,* 557 A.2d 1204, 1206 (R.I. 1989). The defendant appealed the judgment of conviction, arguing that the trial justice erred in denying her motion for judgment of acquittal on the ground that the state did not present sufficient evidence to prove beyond a reasonable doubt that defendant either murdered Luna and Melo with

her own hand or knowingly and intentionally aided and abetted another person in committing the murders. We disagree with defendant's contention.

■ Rule 29(a) provides in pertinent part:

"The court on motion of a defendant * * * shall order the entry of judgment of acquittal of one or more offenses charged in the indictment * * * after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the State is not granted, the defendant may offer evidence without having reserved the right."

In the instant case, defendant moved for an entry of judgment of acquittal "on grounds stated in the rule" after the state had rested. The trial justice denied the motion, and the defense rested. This court has held consistently that a denial of a motion for judgment of acquittal made at the close of the state's case is preserved for appeal only if the defense rests its case at that point, as occurred in this case, or if the motion is renewed by defense at the conclusion of all the evidence. *State v. Clark,* 576 A.2d 1202, 1206 (R.I. 1990); *see Henshaw,* 557 A.2d at 1207; *State v. Roddy,* 401 A.2d 23, 32 (R.I.1979).

■ In reviewing a trial justice's denial of a motion for judgment of acquittal, this court applies the same standard as the trial justice in arriving at the ruling. *State v. Leuthavone,* 640 A.2d 515, 522 (R.I.1994). In deciding the motion, a trial justice must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and must draw all reasonable inferences that are consistent with guilt. *Henshaw,* 557 A.2d at 1206. Unless the evidence, when viewed in such a light, is insufficient to warrant a jury verdict of guilt beyond a reasonable doubt, the motion should be denied. *Id.* at 1206–07; *see also State v. Alexander,* 471 A.2d 216, 218 (R.I.1984) ("[i]f the evidence, when viewed in this manner, fails to establish guilt beyond a reasonable doubt, the motion must be granted").

■ In applying these principles to the instant case, this court concludes that the trial justice properly denied defendant's motion for judgment of acquittal. The statutory definition of murder set forth in G.L.1956 (1981 Reenactment) § 11–23–1, as amended by P.L.1990, ch. 284, § 4, provides in pertinent part:

"**Murder.**—The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by * * * wilful, deliberate, malicious and premeditated killing * * * or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed is murder in the first degree."

Thus, in order to prove first degree murder, the state must prove beyond a reasonable doubt that defendant, with malice aforethought, caused the death of another person willfully, deliberately, maliciously, and with premeditation. *State v. Amazeen,* 526 A.2d 1268, 1271 (R.I.1987). "Murder in the first degree requires premeditation of more than a momentary duration," *State v. Grabowski,* 644 A.2d 1282, 1285 (R.I.1994); *see also State v. Fenik,* 45 R.I. 309, 315, 121 A. 218, 221 (1923) ("[t]he premeditation necessary to establish the first degree of murder must be shown to have existed for more than a barely appreciable length of time before the killing") and requires an intention to kill in addition to premeditation and deliberation about the killing. Wayne R. LaFave and Austin W. Scott, Jr. *Criminal Law* § 7.7(a) at 642–43 (2d ed.1986). "Perhaps the best that can be said of 'deliberation' is that it requires a cool mind that is capable of reflection, and of 'premeditation' that it requires that the one with the cool mind did in fact reflect * * *." *Id.* at 643.

In Rhode Island, "Every person who shall aid, assist * * * counsel * * * or procure another to commit any crime or offense, shall be proceeded against as principal or as an accessory before the fact, according to the nature of the offense committed * * *." G.L.1956 (1981 Reenactment) § 11–1–3. That is, one need not have actually "pulled the trigger" in order to have committed first degree murder. In the instant case counts 3

and 4 of the indictment specifically alleged that defendant aided and abetted Munoz in murdering Melo and Luna, respectively, in violation of § 11–1–3. Although these counts were dismissed, the trial justice instructed the jury in the elements of aiding and abetting pursuant to an agreement between defendant and the state. Because the enactment of § 11–1–3 did not repeal the common law rule that "defendants shall be proceeded against as principals or accessories before the fact according to the nature of the offen[s]e committed by them," *State v. Shapiro,* 29 R.I. 133, 140, 69 A. 340, 343 (1908), defendant in the instant case was in jeopardy either as the principal or as an aider or abettor. *See State v. Medeiros,* 535 A.2d 766, 772 (R.I.1987) ("[i]t is well[-]settled in this jurisdiction that all who participate in a crime are severally responsible as principals, as though each had committed the offense alone").

 In order to find that a defendant aided and abetted the commission of a crime, the facts must establish that the defendant shared in the principal's criminal intent and that there was "a community of unlawful purpose at the time the act is committed." *State v. Gazerro,* 420 A.2d 816, 828 (R.I.1980) (quoting *Johnson v. United States,* 195 F.2d 673, 675 (8th Cir.1952)). The accused must be shown to have participated in the criminal act in furtherance of the common design, either before or at the time the criminal act was committed. *Id.* Conduct of an affirmative nature is required; mere negative acquiescence is insufficient to connote guilt. *Id.* These standards do not require, however, that the accused must foresee the consequences of such unlawful acts, nor do they require that every act of the accused must coincide with those of the principal. *Medeiros,* 535 A.2d at 771. Although mere presence at the scene of a crime is insufficient to warrant a conviction, it is a factor to be considered in a determination of guilt. *Curtin v. Lataille,* 527 A.2d 1130, 1132 (R.I. 1987). Other factors, although not dispositive on their own, include the relationship of the principal and the accused, knowledge that a crime was to be committed, and flight from the scene. *Id.*

 The state produced no direct proof that defendant herself either killed Melo and Luna or aided and abetted their murders by Munoz. No witness testified to seeing defendant shoot the decedents, nor was there direct proof that defendant shared with Munoz an intent to kill the decedents. The state, however, may rest its case entirely on circumstantial evidence without disproving every possible speculation or inference of innocence. *State v. Caruolo,* 524 A.2d 575, 581 (R.I.1987). But in such a case, the evidence must be sufficient to prove guilt beyond a reasonable doubt, not merely raise a suspicion or inference of guilt. *State v. Dame,* 560 A.2d 330, 334 (R.I.1989). The state may prove guilt by a process of logical deduction, by reasoning from an established circumstantial fact through a series of inferences to an ultimate conclusion of guilt. *Caruolo,* 524 A.2d at 581–82. Legitimate inferences may be drawn from proven facts, but pure speculation cannot prove guilt. "The pyramiding of inferences during this process of deduction becomes *. * * insufficient to prove guilt beyond a reasonable doubt when the initial inference in the pyramid rests upon an ambiguous fact that is equally capable of supporting other reasonable inferences clearly inconsistent with guilt." *Id.* at 582; *see In re Derek,* 448 A.2d 765, 768 (R.I.1982).

 Hence, in order to affirm the judgment of conviction, we must be able, after viewing the evidence in the light most favorable to the state, to conclude that sufficient circumstantial evidence proved that defendant, either alone or sharing in Munoz's criminal intent, murdered the decedents deliberately with premeditation of longer than momentary duration. Because we have determined that the evidence, when viewed in light of these considerations, supports such a conclusion, we conclude that the trial justice properly denied defendant's motion for a judgment of acquittal.

The evidence presented by the state reasonably supports the conclusion that these killings were premeditated and deliberate. The trier of fact may use three categories of evidence to infer that a defendant actually premeditated and deliberated an intentional

killing. LaFave, *supra*, § 7.7(a) at 644. These three categories are:

"(1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity;* (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and (3) facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design." *Id.*

In the first category, possession of the murder weapon exemplifies planning activity. *Id.* The evidence was clear in the instant case that the victims were killed by a gun owned by defendant, who falsely reported that it had been stolen. Furthermore, defendant and Munoz went to the victims' home; they did not meet the victims by chance on the street. As to the second category, defendant herself and those with whom she had worked noted that a relationship had existed between defendant and Melo. Evidence of the third category would be demonstrated by wounds deliberately placed at vital areas of the body. *Id.* at 645. Here, both victims were shot in the head in a manner defendant herself described as "execution-style." Thus, the evidence presented at trial proved every element of the crime listed in the statute.

The defendant argued on appeal that her false exculpatory statements concerning the Diaz brothers were "ambiguous facts" upon which other inferences could not be supported without the entire exercise becoming speculative. She also argued that her alleged presence at the scene of the crime did not prove her complicity in these crimes.

These contentions ignore the fact that the initial inference, upon which the others rest, is not ambiguous. The facts disclosed that defendant brought Munoz to Melo's house the day of the murders. The defendant knocked on the door to gain access to the apartment, and she saw Munoz with her gun as they waited for the door to be opened. After the door opened, she watched as Munoz instructed Luna to get "on the floor."

Isabel uncontrovertibly testified at trial that she heard a young woman's voice say, "sierra la puerta." After the gunshots, Israel heard people leaving through the back door.

This evidence and the rational inferences to be drawn therefrom show that defendant affirmatively brought Munoz to Melo's home so that Munoz could gain access to the apartment. Munoz's brandishing of defendant's weapon prior to a confrontation concerning either infidelity or a drug transaction gone sour, or both, bespeaks of defendant's knowledge that a crime was about to be committed. The possible principal, Munoz, was defendant's boyfriend and the father of one of her children, demonstrative of a strong relationship between defendant and Munoz. According to defendant's statement, she fled from the scene but did not contact the police to report the murders. These factors, themselves, are sufficient to support the conclusion that defendant had been present at the scene and had participated affirmatively, in either word or deed, in the commission of the crimes. *See Gazerro*, 420 A.2d at 829. Indeed, the only other reasonable inference that could be drawn from these facts is that *defendant* shot the decedents while Munoz aided and abetted *her*.

When we consider additional facts presented by the state, the circumstantial evidence of defendant's guilt becomes overwhelming. The spent shells at the murder scene supported the reasonable inference that the decedents were killed with defendant's firearm. The defendant falsely reported her gun stolen, the logical inference being that she knew the gun was to be used in a crime. By reporting before the crime that the gun had been stolen, it would appear that she had not been involved. In addition, the gun Munoz used to kill himself was not defendant's weapon.

To the circumstantial evidence concerning the weapons, we must add the testimony of the people in the house at the time the decedents were killed. Israel testified that immediately before the murders he heard a man and a woman arguing, he heard Melo speak to someone using a familiar verb form, and then he heard three loud gunshots. Israel testified that he heard *people* leaving,

but no cars driving away. This evidence leads one to reasonably infer that defendant was in the apartment arguing, and that Melo said, "Please don't do that" to *her*, because there was no evidence of familiarity between Munoz and Melo. Also reasonable is the inference that the killers were within walking distance, an important fact in that defendant lived four blocks from the shootings. Moreover, defendant gave a false statement that implicated two innocent men, and that exculpated, not coincidentally, both herself and her boyfriend. The defendant's story about the victims' residence having been a heroin drop place leads to the reasonable inference that defendant was attempting to persuade the police of the veracity of her heroin story, though the bag of heroin was dry, while everything surrounding it was wet. Although false statements told by a defendant hoping to extricate herself or himself from suspicious circumstances are insufficient proof upon which to convict, they provide circumstantial evidence of a consciousness of guilt and have independent probative force. *United States v. Johnson*, 513 F.2d 819, 824 (2d Cir.1975).

Thus, we conclude that the combination of all the circumstantial evidence presented by the state provided sufficient evidence of defendant's culpability to deny a Rule 29 motion. As the trial justice stated:

"A rational fact finder could, at the very least, viewing this evidence in a light most favorable to the State, enjoying all the inferences in the State's favor find, beyond a reasonable doubt, that the defendant was guilty, at least as an aider and abettor in this murder [*sic*], as well as very possibly, indeed, the shooter. Given the execution style of the killings, unquestionably, these homicides rise to the level of first degree murder."

The trial justice succinctly and accurately appraised the evidence, and therefore, we concur that defendant's motion for judgment of acquittal was properly denied.

## MOTION TO SUPPRESS STATEMENT

The defendant next argued on appeal that the statement she gave to the police falsely implicating Edwin and Sixto Diaz was the product of detention without probable cause and, as such, should have been suppressed by the trial justice. We disagree.

The defendant argued that because she was made to wait alone at the police station for almost two hours on November 27 between the time she gave her statement about the stolen handgun and the time that the police informed her that she was a suspect in the murder she was therefore in custody at this time. At some point during this period defendant claimed that no reasonable person would have believed he or she was free to leave, and therefore, she had been seized without probable cause. At trial, defendant moved to have her statements suppressed. The trial justice denied the motion, finding that defendant was not in custody until Friday, November 30, 1990. We agree with the trial justice's determination.

Drawing from a long line of precedents, this court has set forth the factors to be considered when determining whether a person is seized. *State v. Griffith*, 612 A.2d 21, 23–24 (R.I.1992). A person is seized or under arrest for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave. *Id.* at 23. In making this determination, a court may consider the following factors: (1) the extent to which the person's freedom is curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police. *Id.* at 23–24.

The application of these factors to the instant case confirms that the trial justice was correct in finding that defendant was not in custody on Tuesday, November 27, 1990, and that the resulting statement should not have been suppressed. When the police visited defendant that morning, they did not tell her of the murders. When she was asked to come to the police station, she was told that it was to provide a formal statement concerning the theft of the gun, even though the police were actually investigating the murders at Eastwood Avenue. However, an investigating officer's unarticulated plan has no

bearing on whether a person is in custody at a particular time. *Stansbury v. California,* — U.S. —, —, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 299, (1994) (per curiam) (citing *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317, 336 (1984)). The lack of any communication concerning the murder investigation is crucial because the only relevant inquiry is how a reasonable person would have understood his or her situation. *Id.* at —, 114 S.Ct. at 1529, 128 L.Ed.2d at 299.

The record is devoid of any evidence that defendant did not voluntarily accompany the police to the station. The officers neither pressured defendant nor handcuffed her. *See State v. Kennedy,* 569 A.2d 4, 7 (R.I. 1990). Once at the station, defendant gave her false report concerning the handgun. A reasonable, innocent person would understand as true what in fact was actually happening, namely, that she was at the police station to give a voluntary statement about her stolen gun. This evidence refutes any reasonable conclusion that defendant was in custody pursuant to factors (2) through (4) listed above. The non-custodial setting was not converted into a custodial one simply because the events occurred at a police station or because defendant may have been a suspect. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977); *State v. Marini,* 638 A.2d 507, 511 (R.I.1994).

The defendant argued that her freedom of movement was curtailed by having been kept waiting by the police, and she attempted to distinguish her case from *Griffith* (where the defendant voluntarily accompanied the police to the station) and *Kennedy* (where the defendant was kept waiting in an interview room) by noting that the defendants in those cases were expressly told that they were free to leave. The defendant argued that because she was not told that she was free to leave, she was not free to do so. This argument ignores the essential inquiry in determining whether a seizure occurred: whether a reasonable person would believe she was not free to leave. A reasonable person voluntarily at a police station to give a statement about her stolen gun but kept waiting in a

room would reasonably believe that the police were being impolite, not that they were arresting her. There was no indication that the door to the room was locked, nor that any officer physically restrained defendant, nor that she made any attempt to end her contact with the police, nor that the police brandished weapons or acted in a manner other than professional. Hence, a reasonable, innocent person would believe he or she was free to go in such circumstances because freedom of movement was not curtailed. Indeed, defendant's attendant behavior at this and subsequent contacts with the police appears to have been aimed at exculpating herself and manipulating the police into treating her as a protected witness. It would not be reasonable to believe that someone who subsequently convinced the police to take her into protective custody at a local hotel believed that her movement was involuntarily curtailed by the selfsame police. In any case, the police, upon informing defendant that she was a suspect, carefully ensured that she was informed of and understood her rights. "Advice and information concerning *Miranda* rights will not serve as evidence of an arrest." *Kennedy,* 569 A.2d at 8.

Thus, the defendant was not in custody at any time prior to her statement implicating the Diaz brothers. No reasonable person would have believed so under the circumstances. Because we believe that the defendant was not seized at the time, we need not address her claim that the police lacked probable cause to do so.

Accordingly, the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers in the case may be remanded to the Superior Court.