DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL
On June 19, 1996, after a month-long trial and the presentation of nearly fifty witnesses, a jury convicted defendant Jeffrey Scott Hornoff of first-degree murder in the brutal killing of Victoria Cushman in August of 1989. Hornoff now claims that he is entitled to a new trial. The Court disagrees.
* * *
In considering a motion for a new trial, the trial court, sitting as a so-called "thirteenth juror," must exercise its independent judgment and, in light of the charge to the jury, independently assess the weight of the evidence and the credibility of the witnesses. After that analysis, if the court agrees with the jury's verdict that the defendant is guilty beyond a reasonable doubt, the motion for new trial should be denied. If the court disagrees with that verdict, it must determine whether the evidence is so nearly balanced that reasonable minds might fairly come to differing conclusions; and, if so, the motion must still be denied. State v. Caruolo,524 A.2d 575, 585 (R.I. 1987).
* * *
In August of 1989 Victoria ("Vickie") Cushman resided alone in a small, one-bedroom apartment located within the Alpine Ski/Sports complex in Warwick, Rhode Island, where she was employed. No residence other than hers was contained within the Alpine premises. Her apartment was on the second floor of a building, above corporate offices on the first floor, which was attached to another office building. Adjacent thereto was a large warehouse. The spacious Alpine retail store was situated on the other side, separated from the building which housed Vickie's apartment by a wide parking lot. The Alpine complex was located on Maple Street near Jefferson Boulevard and Interstate 95 in what was principally a light industrial park. Only one other private residence was in the vicinity. An unknowing observer, upon viewing Alpine's extensive complex, would not readily expect to find a residential apartment on the second floor of the building where Victoria Cushman resided.
On the morning of August 11, 1989, Vickie failed to arrive at work. Alpine employees went to her apartment, found her door at the top of the stairs ajar, and discovered her body lying in the living room near an open window above the roof of the front porch. The screen to that window was also found open. Near her body was a fire extinguisher and a pair of inverted yellow rubber gloves.
Warwick police officers who arrived at the scene noticed some scuff marks part way up the exterior of the building near a vertical conduit pipe which was adjacent to the porch. The flower bed below that pipe had been somewhat disturbed, and a small splinter of wood from the porch railing was found in the flower bed. A porch roof shingle near the conduit pipe was bent. The apartment contained several windows, all of which were found open. Each of the screens in those windows was down and locked in its aluminum track. Only the screen above the sloped porch roof was found open.
Upon a cursory view of the scene, the police initially thought that a would-be burglar had shinnied up the conduit pipe to the porch roof, gained entry to the apartment through the window over the porch, was unexpectedly confronted by the occupant, assaulted her with the fire extinguisher, and then fled. The credible evidence adduced at trial proved otherwise.
Vickie was found face down, her head bloodied and beaten and turned slightly to the side. Her lips were bruised and parted, disclosing a small, transparent plastic upper dental guard. No signs of a struggle were present. An open purse which contained her wallet, money, and credit cards, was next to her on the floor but undisturbed, its contents neatly stowed. Numerous other items of significant value, including jewelry, were openly located throughout the small apartment, but none had been displaced or taken.
Although the screen above the porch was open, closer inspection revealed that the screen, like all of the others in the apartment, was of the type which was designed to be opened only from the interior by simultaneously releasing spring locking mechanisms at each lower corner of its aluminum frame. Both of the spring-lock mechanisms of that screen were found to be in good working order. No pry marks or striations were observed on the exterior of the screen to suggest that it had been forced open from the porch roof. The screen mesh itself was completely intact. A small smear of blood was later detected by Dr. Henry Lee, a noted criminalist, near one of the locking mechanisms of that screen.
It was also learned that Vickie had a cat, more particularly, an "indoor" cat, which she never allowed out of the residence unless it was tethered, for fear it would be hit by a car. It is wholly unlikely that Vickie, who constantly worried about the cat escaping and being hit by a motorist, would have left a screen open.
Although the flower bed and dirt area below the conduit pipe were wet, and although there were two apparent muddy marks next to the conduit pipe, no mud or dirt whatsoever was found on or around the apartment floor below the porch window. The porch roof was not at all level. It pitched downward and did not lend itself to sure footing, especially in darkness.
Vickie was clad only in a bathrobe, but it was found closed, the robe's tie firmly cinched and knotted around her waist. At autopsy sexual assault was ruled out.
The medical examiner, Dr. Quentin Sturner, concluded that the assailant had delivered at least one fatal blow to Vickie's head with the seventeen-pound fire extinguisher. Dr. Sturner also discovered bruises on her throat and elsewhere around her face which were unrelated to the injuries generated by the fire extinguisher. He indicated that those bruises were consistent with a disabling act by the assailant, causing her to fall to the floor dazed, stunned, and/or unconscious. Doctor Sturner found no particular signs of defensive wounds. Given the low-angled blood spattering, only some four inches above the floor, Dr. Lee was able to conclude that Victoria Cushman "died as she lay" after falling to the floor, where, in his opinion, she received multiple blows from the heavy fire extinguisher.
No indication of forced entry was observed on the main, first-floor door to this building, nor was there any evidence of a forced entry of Vickie's apartment door, which had been found open at the top of the stairs.
At trial Jack Oscarson, a Warwick police officer who had investigated numerous housebreaks and burglaries, was asked during defense cross-examination to offer his opinion of the scene. Oscarson indicated that the apparent break-in had been staged and that the porch window was not the point of entry.
In view of all of the evidence presented, a jury would have been justified in accepting that opinion. Instead, one would more rationally and readily conclude that the assailant was not an unknown intruder but someone who was known to Vickie, and that he either let himself in or was admitted entrance by Vickie herself, who apparently was ready to retire for the evening. The bedsheets were found turned back, a bedroom light was on, and a book was found propped open, its page apparently saved. It was apparent that after having entered the apartment, the assailant had easily overpowered and subdued Vickie without a struggle, and then bludgeoned her to death with the nearby fire extinguisher, which she kept next to the wood stove in the small living room. At some point the assailant donned the yellow rubber gloves. He then arranged the fictitious break-in scene, including opening the screen above the porch window. In doing so, he transferred the smear of blood which Dr. Lee detected.[1]
Based upon testimony by the medical examiner, the victim's father (who had a telephone conversation with Vickie at about 9:30-9:45 p.m.), and Russell Long, an employee who was downstairs working late and who heard what he recognized as her distinctive footsteps, the time of Vickie's death was established between 10:30 p.m. Thursday, August 10 and 3:00 a.m. Friday, August 11, 1989.
* * *
Victoria Cushman was a 29-year-old single woman who was intent on establishing a relationship with a man which would have some permanency. Earlier in 1989 there had been some minor liaisons, none of which she entered into with any degree of commitment or with any real or lasting interest on her part.
Vickie's interest in and her perceived relationship with Scott Hornoff, however, was markedly different. Plainly, she carried a torch for Hornoff, a Warwick police officer. Indeed, he had given her reason to believe that their relationship had potential for the constancy she was seeking. Although she was aware that Scott Hornoff was married and had a child, she was not deterred. She had a belief that he would forsake his wife for her, and that expectation was not based on mere whimsy. The credible evidence indicates that the defendant had, in fact, told her that his marriage was not on an even keel. Even if his marriage had been harmonious, he told Vickie that it wasn't in order to mislead her into believing that he was available. Hornoff had, to put it plainly, set the hook.
Thus, Vickie approached Jack Oscarson, a colleague of Hornoff's and a member of Hornoff's scuba diving team, and asked him whether Hornoff was happily married and whether he thought Hornoff might consider leaving his wife. Oscarson, clearly impressed that she had strong feelings for Hornoff, told her that he didn't know. Vickie also exhibited anticipation and excitement when she confided in Alpine co-workers, such as Amy Parker, Kerri Martin, and Joann Archetto, that her prospects with Hornoff were promising, irrespective of his marriage, and that she was intent on pursuing the relationship with him. Such intensity on Vickie's part was not without corroboration. Vickie's sister as well as other friends testified that Vickie was "headstrong," and that when focused on a man, she pursued him with such aggressiveness that it was not at all uncommon for him to be intimidated and, indeed, dissuaded from continuing the relationship.
It was apparent to Vickie's confidants as well as to others at Alpine that shortly before her death the affair with Hornoff was ongoing and steady. Donald Mong, an East Greenwich police officer who also worked part-time at Alpine, saw Hornoff and Vickie in each other's company at Alpine on numerous occasions. Further, he noticed Hornoff's car parked at or very near Vickie's apartment on almost a continuous basis, far from the area of the Alpine premises where customers and dive-team members would ordinarily park in order to replenish their heavy scuba tanks with oxygen.
Vickie made it clear to Kerri Martin on August 5 that she was not at all intimidated by Hornoff's marriage and that she was bent on maintaining the relationship. Vickie's closest Alpine confidant, Joanne Archetto, recounted Vickie's statements to her regarding regular visits and telephone calls between Vickie and Hornoff. To Mrs. Achetto, who had seen Hornoff and Vickie "shoulder-to-shoulder" in the Alpine parking lot about a month before her death, Vickie appeared more excited and intense with each passing week. By August 8 it was clear to her that the relationship between Vickie and Hornoff was on a fast track.
At some point between the morning of August 8 and the morning of August 9 things changed. Early Wednesday morning, August 9, a distressed Vickie Cushman told Mrs. Archetto that Hornoff had announced to her that he wanted to discontinue the relationship and "to end it for family time." Mrs. Archetto described Vickie as not only surprised and upset but, more significantly, angry; and clearly intent, in her typically aggressive fashion, not to let Hornoff go easily.
Scott Hornoff knew that Vickie would not be easily dissuaded. He even went to the extent of parading his wife and child through the Alpine retail store in an effort — as his brother, David, recounted and as the defendant himself fairly conceded at the grand jury — to convince Vickie that he was no longer available to her. That charade did not deter her, either. Vickie passed him a note demanding that he telephone her.
At some point shortly before her death, and obviously after Hornoff had precipitously tried to discontinue their relationship, Vickie Cushman composed a letter to Hornoff which the police found at the murder scene. Although undelivered, that letter unquestionably bespoke much more than merely the two happenstance sexual indiscretions asserted by the defendant. Moreover, not only does the letter reflect what even any casual reader would discern to have been an ongoing, serious relationship which the defendant had attempted to terminate, it also bore the hallmarks of the unsettling conversation which Hornoff earlier had with Vickie and which caused her such consternation and anger on the morning of August 9 as related by Mrs. Archetto.[2]
In all, any factfinder would have had little difficulty concluding that by August 9 Scott Hornoff had found himself in a situation over which he no longer had control. Having deceitfully induced Vickie to believe that he was available to her and having achieved his goal, he now had to contain a headstrong, aggressive woman who, he realized, would not at all accept his spurnings lightly or gladly, and, indeed, would openly resist them.
Fearing that the exposure of their affair would, as he later admitted, ruinously endanger his marriage and his job, Hornoff decided later the next night to confront Vickie and, in demonstrable fashion, eliminate that danger.
* * *
On Thursday night, August 10, Hornoff arrived at a party hosted by Ray Gallucci, a fellow Warwick police officer, and his wife, Debra. The guests principally consisted of Warwick police officers. In attendance was Steve Branch, a Warwick officer and also a fellow diver. Branch had concocted a punch laced with wine, gin, and vodka. Hornoff brought a beach cooler filled with beer. He drank both beer and punch. Also attending that party was Warwick police officer David DelBonis. Neither DelBonis nor Debra Gallucci, who was pregnant at the time, drank any alcoholic beverages. Rhonda Hornoff arrived separately with their infant son, but they left before 11:00 p.m. Hornoff remained for awhile but departed sometime after 11:00 p.m. with his brother, David. When he left, Scott Hornoff was described by witnesses as very sociable, in a very good mood, and intoxicated but not as drunk as others.
Both Debra Gallucci and David DelBonis testified at trial that they saw Scott Hornoff return to the party between 1:00 a.m. and 2:00 a.m. His demeanor and attitude, however, had changed dramatically. He appeared pale, stunned, and in a daze, as well as abnormally uncommunicative. He stayed only a short time, perhaps fifteen to twenty minutes, retrieved some cassette tapes, and then left.
Hornoff's whereabouts between the time he left the Gallucci party and later returned fall squarely within the period of time within which Vickie Cushman was murdered. Various versions of his whereabouts were offered at trial, all by the Hornoffs: David, Rhonda, and Scott (through his two 1992 and 1993 State Police interviews and his 1994 grand jury testimony). All of them were at significant variance with each other.
To Captain Carter and Lieutenant Johnson at the August 11, 1989 interview Hornoff had disclosed little more than that he had been at a party the previous night. At no time did he advise them that he had left and returned later. When interviewed by the Rhode Island State Police in 1992, he told Detectives Richard Hurst and Thomas Denniston that his brother, David, drove him home from the party before midnight, dropped him off, and immediately departed. As he was just about to enter his house, he changed his mind and drove his Subaru back to the nearby Gallucci residence to reclaim some cassette tapes.
David Hornoff's version did not square with Scott's. According to Scott, he never entered his residence. David said that after he dropped Scott off, he saw him enter his residence and "disappear from view."
At trial, Rhonda was rather exact. She claimed that she knew her husband had returned home at about 11:30 p.m. because she was in bed watching television. She said that the news had ended and that the Johnny Carson Show was just commencing. According to Rhonda, Scott then came upstairs and asked her whether she had fed their dogs. She told him that she had not. Rhonda recounted that he then went downstairs, used the bathroom, fed the dogs, and roughhoused with them for awhile in the back yard. He then came upstairs at about 12:30 a.m., a time she fixed because the Carson show had concluded and the David Letterman show was about to start. She testified that he was "amusingly drunk" as he tried to remove his socks. He then went to sleep with a pillow over his face. She said that when she awoke at about 2:00 a.m. to tend to their infant son, Scott was asleep in bed.
Rhonda's purported specific recall was sorely contradicted by the trial testimony of Debra Gallucci and David DelBonis — each of whom, without ever having consulted with one another before they had earlier offered their recollections to the grand jury, stated that Scott returned to the Gallucci residence as late as 2:00 a.m.
Furthermore, on August 11, 1989, Warwick Detectives Richard Santos and Kevin Collins spoke with Rhonda at her home at about 4:00 p.m., approximately the same time that Hornoff met with Carter and Johnson. Santos and Collins asked Rhonda about her husband's whereabouts the previous night (on the pretext that he had been involved in an altercation with a motorist during the late night hours). Notwithstanding her explicit grand jury and trial testimony, she told the two detectives that she did not know when her husband had come to bed.
More importantly, after Santos and Collins left, Rhonda called Steve Branch, Hornoff's best friend, and asked him if he knew of Scott's activities the previous night, indicating to Branch that she was entirely clueless as to when, if at all, Scott had arrived home or if he had ever come to bed, and wondering whether he had partied "until the sun came up."
At his appearance before the grand jury in 1994, Scott Hornoff abandoned and expressly disavowed the explanations which he had earlier provided to the State Police. Instead, he claimed a loss of memory ("My brain chose not to remember," he said) because he was allegedly too drunk to recall. Although Hornoff had previously told the State Police that when he left the Gallucci Party he was only "mildly intoxicated," having consumed only six beers and two cups of punch, he told the grand jury that he had been in a drunken stupor, having consumed twelve beers and ten glasses of the dreaded spiked punch. Accordingly, at the grand jury session Hornoff related that because of his claimed loss of memory (although he was nonetheless able to remember exactly how much and precisely what he had to drink), he would adopt Rhonda's recall of his arrival at home because, he said, she had a much better recollection of the night's events.
What was clear to the trial jury and to this Court, however, was that Rhonda's statements to Detectives Santos and Collins, and, more importantly, her August 11 telephone call to Steve Branch, reflected that she had absolutely no idea when or if her husband had ever returned home or had even come to bed that night. Any factfinder would conclude — as this jury obviously did and as this Court does — that the explanations by way of alibi offered by the defendant, his wife, and his brother were nothing more than mendacious afterthoughts, in a lame effort to exculpate Scott Hornoff.
In a further transparent and futile effort to support her husband, Rhonda suggested at trial that the pale, sick look on Scott's face upon his return to the Gallucci party, as seen by Mrs. Gallucci and and David DelBonis, must have been the result of Scott's having mixed beer with Branch's liquor-laden punch. Rhonda claimed that Scott would typically become ill when he consumed both beer and liquor. In fact, both David Hornoff at trial and the defendant himself at the grand jury testified that he was not at all ill when he initially departed the Gallucci party. He was by all accounts, including his own, his brother's, and those of Mrs. Gallucci and DelBonis, upbeat, convivial, in a good mood, and not at all sick or out of sorts.
Without any doubt, the scenarios offered by the defendant, by Rhonda Hornoff, and by David Hornoff were nothing more than empty, wishful alibis which were wholly lacking in credibility.
* * *
On August 11, 1989, the defendant reported for his 4:00 p.m. shift. He had not yet been advised that he was a suspect. He was overheard by Detective Kenneth Anderson to mutter that he thought he knew the girl who had been killed, an understatement, to say the least. He had, some several minutes earlier, told Detective Michael Babula that he knew Victoria Cushman "very well." However, when Hornoff was thereafter confronted by Captain Carter and Lieutenant Johnson and formally advised that he was a suspect, he immediately lied and denied knowing her. Incrementally and only grudgingly did he admit to them in terse and rather coarse fashion that he had only a brief sexual encounter with her but had been fearful of telling them lest his wife, Rhonda, learned of it.[3]
The defendant's immediate false exculpatory statements were made even though Carter had assured him at the outset that neither he nor Johnson had any interest in his extra-marital activities and that his job as a Warwick detective was not in jeopardy, so long as he was truthful with them. The defendant opted to be dishonest at the very outset and immediately lied to them about ever having known Vickie Cushman. Although false statements told by a defendant in an effort to extricate himself from suspicious circumstances are not, by themselves, proof upon which to convict a defendant, they can be circumstantial evidence of a consciousness of guilt and they do, in this Court's view, have independent probative force in this case. See, State v.Diaz, 654 A.2d 1195, 1204 (R.I. 1995).
Add to this the defendant's professed stunned expression when told by Detective Babula that Vickie Cushman was the victim of the homicide on Maple Street. Hornoff already knew full well that she was the victim, because (quite apart from the ultimate reason) his brother, David, had expressly told him so in a telephone conversation before the defendant went to work that afternoon.
I reject, as unworthy of belief, David and Scott's testimony that David merely and in cramped fashion told Scott that "a female had been murdered on Maple Street and you know who lives on Maple Street" Before calling his brother, David had already spoken with an officer at the Warwick police station and had ascertained that the victim was Victoria Cushman. David Hornoff was also well aware that Scott had been carrying on a sexual relationship with her. It is inconceivable that David Hornoff did not expressly and explicitly tell his brother in that earlier afternoon telephone conversation on August 11 that Vickie Cushman had been killed. It is the firm view here that when Scott Hornoff professed shock and amazement upon Babula's announcement, it was nothing more than a predetermined, feigned and contrived facade.
Furthermore, one can hardly ignore the significant inconsistencies with which the defendant was confronted by Detectives Denniston and Hurst in March 1993 at the second State Police interview and the defendant's irrational and irreconcilable efforts to explain them;[4] including, for example, whom he had called upon hearing from Detective Babula that Vickie Cushman had been killed. Hornoff offered an olio of contradictory responses. First, he said that he had called no one. Hornoff was then confronted with the fact that Babula had said that Hornoff immediately had gone to a telephone and was heard to say, "Vickie's dead; she was murdered; she's the one who was killed."
At that point Hornoff tendered his next explanation, saying instead that he must have called his brother, David. That response made no sense, either. Denniston and Hurst told him that they knew that David Hornoff was already aware that Victoria Cushman had been killed and had so told the defendant in a telephone call before the defendant arrived for his 4:00 p.m. shift. The defendant's specious reply was that David must have been "mistaken," and if he's not mistaken then I simply forgot."
When that response was, as it should have been, found wholly lacking, the defendant's third improbable offering was that he must have called his attorney. It was clear, however, that his attorney had no idea that Scott Hornoff had been having sexual encounters with Vickie Cushman or that his lawyer had even the vaguest notion of anyone named Vickie Cushman.
Finally, the defendant suggested that it must have been Rhonda whom he had called. That response was even more ludicrous than Hornoff's earlier offerings. Rhonda was unaware at 4:00 p.m. on August 11, 1989 that anyone had been killed on Maple Street. All that she knew was what Warwick detectives Santos and Collins had told her: that her husband had been involved in a late-night altercation with a motorist. At trial, she acknowledged that she had not taken particular note of any newscast on television regarding a Maple Street murder. Moreover, it made absolutely no sense that Hornoff would have called his wife to tell her that the very woman with whom he had been having an affair had just been killed.
Yet, we know from Detective Babula that the defendant immediately went to a telephone and spoke the words Babula heard. If he didn't call his brother, or his attorney, or Rhonda — and it is clear that he did not — then whom, if anyone, did he call? The Court is convinced that the defendant's first answer was the correct one: He called no one. His words into the telephone, although uttered, were spoken to absolutely no one on the other end. That purported "telephone call" was a preordained, disingenuous sham, just as was the defendant's feigned astonishment upon hearing from Babula (as well as from his brother) that Vickie Cushman had been murdered.
Furthermore, this jury undoubtedly must have found utterly preposterous the defendant's suggestions to Denniston and Hurst that Vickie Cushman may have committed suicide. At this point the defendant, who had long before been fully apprised of the autopsy report and the manner and means of Vickie's death, was utterly and absurdly desperate in an attempt to search for a way out.
Lastly, one cannot ignore the appearance and demeanor of the defendant, as described by Hurst and Denniston during that March 1993 interview, when Hornoff's vacuous explanations, including his faulty time line, were exposed. Hornoff became upset, holding his head in his hands and looking silently at the floor, an image strikingly similar to the one he exhibited on August 11, 1989, and described by Detective Anderson just before Hornoff was to be interviewed by Carter and Johnson two and one-half years earlier at the Warwick police station: Hornoff with his head in his hands, staring silently at the floor.
Perhaps in 1989 that image, by some means, might have reflected his stated fear that Rhonda would discover his affair with Vickie Cushman, causing his marriage and his life to be ruined. No such conclusion can be drawn from this similar image at the State Police headquarters in March of 1993 when Hornoff was again described as morosely staring at the floor with his head in his hands after being unable to explain serious and significant discrepancies in his stories. By March of 1993 the defendant's fears, which he had expressed to Carter and Johnson in 1989, had never materialized. Rhonda, for inexplicable reasons, had elected to remain with him notwithstanding her husband's numerous infidelities, and Hornoff had not been dislodged from his job as a Warwick police detective even though his superiors knew that his sexual encounters with Vickie Cushman had occurred while he was on duty.
Instead, the jury was well entitled to conclude, as does this Court, that the image of Scott Hornoff in March of 1993, with his head in his hands and staring morosely at the floor, was a reflection of a man overborne with guilt; not the guilt of infidelity to his wife, but the guilt of a man who had committed the most unpardonable of acts.
* * *
This Court is cognizant that the State's case rested largely upon circumstantial evidence, but the law is also clear that the State may prove its case beyond a reasonable doubt entirely by circumstantial evidence. Much of the State's evidence, however, was also dependent upon an assessment of the credibility of the many witnesses who testified.
Evaluating the credibility of witnesses is quintessentially a task for the jury. Unquestionably, these jurors found the trial testimony of David Hornoff and Rhonda Hornoff, as well as Scott Hornoff's grand jury testimony and earlier explanations utterly devoid of credibility. They were well justified in doing so.
Furthermore, the defendant's own evidence at trial was of no great significance, in both this jury's determination and in this Court's view. The testimony of Dr. Jean Arthur, Vickie Cushman's dentist, was of little or no moment. Indeed, when asked by defense counsel on redirect examination to confirm that Vickie would only wear her dental guard at night — presumably in an effort to demonstrate that she would be too embarrassed to wear it in the presence of anyone much less the defendant — Dr. Arthur, in what must have been a rather uncomfortable rejoinder to the defendant, responded that Vickie, indeed, could well have worn it all day if she had been under stress. In short, Dr. Arthur's testimony, while clinically interesting, assisted the defendant very little, if at all.
Further, it matters not at all that Detective Janice Markey may not have been the Warwick officer who told David Hornoff early in the afternoon of August 11 that Vickie Cushman had been murdered. Some Warwick officer did, upon David's inquiry, identify Vickie Cushman as the victim, and David immediately called Scott and imparted that information to him well before Scott had arrived at the police station for his 4:00 p.m. shift.
* * *
From all of the evidence and the reasonable inferences therefrom, this Court is well persuaded that Scott Hornoff left the Gallucci party with David sometime after 11:00 p.m., retrieved his vehicle from his nearby residence, and then drove the short distance to Vickie Cushman's apartment in a final and significant effort to dispirit her, in any way necessary, from pursuing him, because he believed that she presented a serious risk that could jeopardize his marriage and cost him his job. In short, Hornoff was fearful that exposure of his relationship with Vickie, as he admitted to Carter and Johnson, could ruin his life.
Either Hornoff let himself into Vickie's apartment or she willingly opened the door for him.[5] An unpleasant confrontation obviously ensued. He then overpowered her, and she fell stunned and dazed to the floor. Thereafter, he bludgeoned her to death with the nearby fire extinguisher, which was, as so often referred to at trial by the defense, a weapon of convenience.
Whether he put on Vickie's kitchen gloves before or after he killed her is not material. If, as Dr. Sturner indicated, she lay unconscious or sufficiently dazed, Hornoff certainly had time to put them on before he delivered the fatal blows. It may well be that Hornoff put on the gloves after he had beaten her to death and then wiped down the fire extinguisher.[6]
In short, it matters little when Hornoff donned the gloves. What is significant is that he did put them on because, as a detective, he understood all too well the evidentiary power of fingerprints and forensic evidence; and, as well, because he knew that he would be a focus of suspicion as a result of his relationship with Vickie Cushman. He simply could not afford to leave any trace evidence.
In an effort to avoid suspicion, he then hastily arranged the scene to make it appear that an unknown intruder had attempted to burglarize the apartment through the porch window and had killed its unforeseen occupant. The evidence adduced at trial, however, convincingly dispelled that untenable ruse and led ineluctably to this defendant.
* * *
The record in this case is extensive, not only because of the great number of witnesses, but also as a result of the uncommon latitude which the parties requested and were afforded in their examination of them. Accordingly, all of the State's evidence, whether direct or principally circumstantial, cannot be readily or neatly catalogued herein.
While not discursive, the foregoing has been set forth to indicate but some of the more telling and significant aspects of the State's evidence, the entirety of which — upon review by this Court from its vantage point as a daily, front-row observer — was presented so convincingly and with such compelling force as to leave no doubt here that Jeffrey Scott Hornoff was properly and deservedly convicted of first-degree murder.
The defendant's motion for a new trial is hereby denied.
Enter: By Order:
_______________________ ____________________ Robert D. Krause Asst. Clerk Associate Justice
[1] At trial, and for the first time in seven years, Warwick BCI officer James Ellis speculated that he might have somehow cut himself while examining the screen at the police station, which he surmised might account for the blood smear. Based on the evidence, however, and particularly Dr. Lee's testimony, Detective Ellis' speculation cannot be accepted.
[2] The letter is set forth in its entirety in the Appendix hereto.
[3] In fact, the defendant similarly told the State Police, at his first meeting with them in November of 1992, that he "was very fearful for my wife to find out." That fear must have been very real, because the defendant did not disclose to Rhonda his affair with Vickie until May of 1992; and, the only reason he did so was because he learned that the Providence Journal was about to publish a story recounting that he again had become a suspect in the Cushman murder. Even then, he didn't reveal to her his several other sexual liaisons; he waited until the fall of 1992 to do so.
[4] At the grand jury Hornoff suggested that any inconsistencies were simply the result of the State Police detectives insisting that he take his "best guess" when he claimed that he could not recall. Detective Denniston flatly denied that either he or Detective Hurst ever directed him to guess. The trial jurors plainly discounted Hornoff's shallow suggestion, and it is the Court's view that they were entirely warranted in doing so.
[5] Although Victoria Cushman had offered him a key, Hornoff claimed that he declined to accept it. In view of the many instances reflecting the defendant's lack of candor and his dishonest and feigned memory lapses, a jury would have been well warranted in disbelieving the defendant. Indeed, given the frequency of his visits to Vickie's apartment, as related by Mrs. Archetto, along with his car being regularly sighted at Vickie's apartment by Mr. Mong, it is plain that the defendant had continuous and easy access to her apartment.
[6] So as not to further expand the pages of this decision unnecessarily, the Court incorporates by reference its comments of June 17, 1996, regarding the blood smears observed on those gloves by Detective Ellis and the instructive testimony of Dr. Lee.
APPENDIX

Letter addressed to Scott Hornoff found by the police at the
murder scene:
 "Scott,
 I know how hard this whole situation must have been
 for you — as you said — a major dilemma. I wanted to
 be the kind of person who was strong enough to
 say — "your best interests come first, I'll let you
 go easily." But couldn't and I can't.
 I have so much fun with you, you are always making
 me laugh. I feel like a million dollars when I'm
 with you. And everytime I look at you my knees get
 weak, I get goose-pimples all over, and it takes
 every bit of will power I've got not to maul you
 immediately. I think of you as soon as I wake up,
 and you are my last thought as I put my head down
 to go to sleep. During the day I wish for you to
 either call or come in, and my day doesn't feel
 complete until I see you. I'm hooked on you.
 I love to kiss your arm where the elbow is. I love
 to nuzzle your neck and ears. I think your body is
 gorgeous and I love to touch it, running my hands
 over every inch of it. I strongly believe you only
 live once and you should make the most of it — we
 are too well suited (see — I didn't say anything
 about chemistry) for us not to spend time together.
 If I wait for you to try and work things out I fear
 I will lose you — you are saying now that I can't
 lose you because I never had you, but you're
 wrong — we had alot over these past few weeks.
 Something special happened, that I can't easily
 deny or ignore.
 I know you are married with a beautiful little
 boy — I know you don't want to risk losing that. But
 you admitted that things were not on an even keel
 at home, it sounds to me that making love with me
 won't make matters worse.
 I know that there isn't much hope for any kind of
 future for us — but at least there can be a present.
 I miss you terribly already. I want to see you so
 very badly.
 Vickie"