STATE

v.

Chester R. BRIGGS.

No. 99–145–C.A.

Supreme Court of Rhode Island.

July 17, 2000.

Jane M. McSoley, Aaron L. Weisman, Stephen G. Dambruch, Randall White, Providence, for Plaintiff.

John F. Cicilline, Bristol, Marie T. Roebuck, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## O P I N I O N

BOURCIER, Justice.

Chester R. Briggs stands indicted for the February 19, 1997, murder of Patricia Jacques. Following a pretrial hearing, a Superior Court trial justice granted Briggs's motion to suppress statements made by Briggs when questioned by members of the Rhode Island State Police at the New Hampshire State Police Headquarters, and to suppress introduction at trial of evidence found in a trash bag seized from a dumpster on property Briggs owned in New Hampshire. The state appeals.

The defendant Briggs appeals from the denial of his motion to suppress certain other statements he made prior to being questioned at the New Hampshire State Police Headquarters, and additionally contends that the trial justice erred in applying Rhode Island law when passing upon the various motions.

## Facts and Procedural History

On Wednesday, February 19, 1997, at 11:52 p.m., Tiverton rescue personnel were called to the scene of a shooting at 149 Nanaquacket Road in Tiverton, Rhode Island. There, Patricia Jacques (Mrs. Jacques), was discovered lying fatally shot near the property's adjacent stables. During a search of the crime scene, a handwritten note addressed to "Chester" was found. The note contained the defendant's fax number and requested an explanation concerning the return of money belonging to the victim. The ensuing homicide investigation revealed that Mrs. Jacques previously had entrusted approximately $80,000 to the defendant for safekeeping. The investigation further revealed that the defendant visited Mrs. Jacques's residence on the night before the murder and left a note indicating that he probably would return the next day. In addition, two witnesses saw a pickup truck similar to one owned by the defendant leave the general crime-scene area shortly after they heard gunshot sounds.

Two days later, on February 21, 1997, members of the Rhode Island State Police and the Tiverton Police decided to visit and speak with the defendant at his residence at 111 Kaime Road in Chichester, New Hampshire. Upon arriving in New Hampshire, the Rhode Island police were joined by a member of the New Hampshire State Police, and they went to the defendant's residence. Once there, they encountered Robert Courtemanche (Courtemanche), a neighbor and tenant of the defendant, who lived at 109 Kaime Road. Courtemanche told the police that Briggs was not home.

Shortly thereafter, the police, while waiting for Briggs to return, observed Courtemanche drive away in the defendant's pickup truck. They followed him for approximately fifteen miles to a multidwelling tenement house, also owned by the defendant, in Pittsfield, New Hampshire.[1] There they observed Courtemanche remove a white trash bag from the back of the defendant's pickup truck and throw it into a dumpster located in the property's parking lot. After Courtemanche left, the police immediately seized the bag and then followed Courtemanche back to Chichester.[2]

Soon afterward, at approximately 7 p.m., the defendant arrived home accompanied by a friend, Norman Cease (Cease). Detective Corporal Elwood Johnson, Jr.,[3] (Detective Johnson), Detective Nicholas Tella (Detective Tella) of the Rhode Island State Police and a member of the New Hampshire State Police greeted the defendant and offered him their condolences on the loss of his friend, Mrs. Jacques. After the detectives told him that they were conducting a homicide investigation and that they wanted to ask him some questions, the defendant invited the detectives into his home.

Inside his home, the defendant told the police that on February 18, 1997, he had been to the Jacques's home to give Mrs. Jacques $5,000. He revealed that she had called him the next day (the morning of her murder), and he volunteered to show the police his telephone caller ID box. He informed them that he kept a gun in the house and allowed the police to inspect it. Approximately fifteen minutes later, the detectives asked the defendant to accompany them to the New Hampshire State Police Headquarters (police station) for questioning. The defendant readily agreed. The defendant and the police then left the defendant's home in three

---

1. The record indicates that the police were unaware that the defendant owned the tenement property at the time that they witnessed Courtemanche dispose of the trash bag.

2. A subsequent search of the trash bag revealed documents in the defendant's name,

records of fax transmissions to the Jacques household, clothing, and a pair of new, but mud-covered, sneakers.

3. Detective Johnson since has been promoted to Detective Sergeant.

separate vehicles. The New Hampshire state trooper drove alone to the police station. Cease and the defendant drove in Cease's vehicle, and the Rhode Island detectives, in a third car, followed Cease and the defendant.

At the police station, they were met by Corporal Russell Conte (Corporal Conte) from the New Hampshire State Police. The defendant was brought into a small room, and Cease remained in the hallway. Before the questioning began, the defendant was informed that he was a suspect in the Jacques homicide investigation and was read his *Miranda* rights.[4] He read aloud the *Miranda* rights police form, and then initialed and signed the form indicating that he understood all his *Miranda* rights. He additionally signed two written police consent forms in which he consented to the search of both his residence and his pickup truck. Subsequently, the defendant was questioned for approximately twelve to thirteen hours, six and three-quarter hours of which were tape-recorded.

During the course of the questioning, the defendant casually and readily explained his relationship with the victim and her two children, Ronald and Robin Seavey. Apparently, he met Mrs. Jacques some sixteen or seventeen years earlier, when her son Ronald was placed with him in foster care after becoming a ward of the State of New Hampshire. He explained that Mrs. Jacques and her husband previously had suffered financial difficulties and had given him approximately $100,000 of their assets to conceal from their creditors and from the Internal Revenue Service. Once their financial difficulties had been cleared, the defendant said he began returning their money to them at various intervals. He stated that he had returned the final installment of $5,000 in cash on the night before the murder by leaving it, and a note, in an envelope under the front seat of Mrs. Jacques's car. He claimed that Mrs. Jacques called him on the following day to thank him. The defendant stated that he first learned that she had been murdered when Ronald called him at approximately 10:30 p.m., on Thursday, February 20, 1997, the day after the murder.

During the course of the questioning by Detectives Johnson and Tella, they made numerous references to the defendant's sexual orientation and habits, his closet homosexuality, and his alleged sexual relationship with Ronald when Ronald was a minor.

At the suppression hearing, Detectives Johnson and Tella conceded that the majority of their unrecorded conversations with Briggs did, in fact, relate to sexual matters. The taped and recorded portion of the questioning also reveals that the detectives again asked the defendant many questions relating to those same matters. Such questions included: what kind of sex he participated in, with whom did he have sex, and whether he and Ronald were circumcised. During the thirteen hours of questioning, however, the defendant repeatedly denied any involvement in the murder and made numerous statements intended to exculpate himself from the homicide.

The record also reveals that the questioning of the defendant took place in a small room containing only a table, several chairs and a telephone. Although several breaks of varying duration were taken during the questioning, the defendant never was left alone, and when he went to the bathroom, he always was accompanied by an officer. Briggs's bathroom visits, it appears, actually were prompted by suggestion of the police. During the questioning, the defendant was offered food and drink, but he declined it. As the questioning progressed, the defendant, several times, began to inform the detectives that he was tired; however, at no time did he ever request a break or ask them to interrupt or to stop the questioning, and there is no evidence in the record to show that

---

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the defendant ever asked for an attorney. His one request was to make a telephone call, and that request readily was granted.

It appears from the tape recordings of the questioning that the defendant always assumed that he would be released at the conclusion of the questioning, and he went so far as to offer to allow the Rhode Island State police detectives to sleep over at his house in New Hampshire before returning to Rhode Island.

At his pretrial motion hearing, the defendant moved to suppress all the statements that he made both while at his home and when later questioned at the police station. In addition, he moved to suppress the admission of the contents of the trash bag that the police had seized from the dumpster in the parking lot of the Pittsfield property that he owned. The defendant asserted that New Hampshire law, certainly favorable to him, should be applied by the trial justice in determining his suppression motions.

After the hearing on the suppression motion and after listening to the tape-recorded questioning and the arguments of counsel, the trial justice determined that he would apply Rhode Island law in ruling on the motions. He then granted the defendant's motion, suppressed all the statements the defendant made at the police station, and precluded admission at trial of the contents of the trash bag. He denied, however, the defendant's motion to suppress all his non-police-station statements. These appeals followed.

Additional facts will be provided as needed.

## Analysis

### 1. The Defendant's Statements

#### (a) Choice of Law

■ The defendant asserts that the trial justice erroneously applied Rhode Island law in determining the admissibility of the statements that he made both at his residence (the non-police-station statements), as well as at the New Hampshire State Police headquarters (the police station statements). The defendant, apparently believing that the state would not be able to meet New Hampshire's higher standard of proof in determining the admissibility of his statements, contends that the law of that jurisdiction should have been applied.[5] He contends that his constitutional rights were violated when he made his statements in New Hampshire, and that New Hampshire had a greater interest in the outcome of the hearing because the statements were taken in that state, where he, the decedent's children, and many of the witnesses in the case resided. Consequently, he asserts that the trial justice should have applied New Hampshire law in determining the admissibility of his statements. We disagree.

We have stated previously that "the procedural law of the forum state applies even if a foreign state's substantive law is applicable." *Israel v. National Board of Young Men's Christian Association,* 117 R.I. 614, 620, 369 A.2d 646, 650 (1977). In the present case, the trial justice determined that Rhode Island law controlled the admissibility of the defendant's statements.[6]

**5.** Under New Hampshire law, the state has a higher burden of proof in determining the admissibility of a defendant's statement than that of Rhode Island. In New Hampshire, the law requires proof beyond a reasonable doubt. *See State v. Sullivan,* 130 N.H. 64, 534 A.2d 384, 387 (1987) (reiterating that the state has the burden to prove the voluntariness of a statement "beyond a reasonable doubt" before it may be admitted). Rhode Island law, however, requires only that the state prove the voluntariness of a statement by clear and convincing evidence. *See State*

*v. Nardolillo,* 698 A.2d 195, 200 (R.I.1997) (requiring the state to "first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his constitutional rights expressed in *Miranda* * * * ").

**6.** In making this determination, the trial justice employed an interest-weighing approach. Because we conclude that the admissibility of these statements is controlled by Rhode Island evidentiary law, we need not comment on that analysis.

In *State v. Pailon*, 590 A.2d 858, 863 (R.I. 1991), we said that the reliability and concomitant admissibility of a confession is an evidentiary matter that is governed by the evidentiary laws of the forum.

Likewise, in this case, the admissibility of the defendant's statements was an evidentiary matter and concern; consequently, the law of the forum applied and the trial justice did not err when he applied Rhode Island law. *See Pailon,* 590 A.2d at 863; *State v. Bello,* 417 A.2d 902, 905 n. 3 (R.I.1980) ("proving the admissibility of the evidence, as opposed to elements of the substantive crime, the standard of proof in this jurisdiction is 'clear and convincing evidence' and not 'beyond a reasonable doubt,'" quoting *State v. Gianoulos,* 122 R.I. 67, 73 n. 2, 404 A.2d 81, 84 n. 2 (1979)). *See also* John Bernard Corr, *Criminal Procedure and the Conflict of Laws,* 73 Geo.L.J. 1217, 1217 (1985); Wayne R. La-Fave et al., 3 *Criminal Procedure,* § 10 (2d ed.1999).

## (b) Suppression of the Statements

In this case, the defendant filed motions to suppress all the statements he gave while at his home and while in custody at the police station. The trial justice denied his motion to suppress the statements he made to the police at his home, but granted his motion to suppress all the statements he made at the police station.

■ We have stated that:

"In reviewing a trial justice's decision on a motion to suppress a confession that is claimed to be involuntary, we perform a two-step analysis. First, we review the trial justice's findings regarding the historical facts relevant to the voluntariness of the challenged confession. Next, we apply those historical facts and review the trial justice's determination as to the voluntariness of the challenged confession de novo." *State v. Humphrey,* 715 A.2d 1265, 1273 (R.I. 1998) (citing *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *State v. Campbell,* 691 A.2d 564, 569 (R.I.1997)).[7]

In doing so, "we accord deference to the trial court's factual findings concerning the historical events pertaining to the confession by using a 'clearly erroneous' standard of review." *State v. Brouillard,* 745 A.2d 759, 762 (R.I.2000) (quoting *State v. Carter,* 744 A.2d 839, 845 (R.I.2000)).

"We will reverse a trial justice's findings on a motion to suppress only if (1) his or her findings concerning the challenged statements reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." *State v. Garcia,* 743 A.2d 1038, 1044 (R.I.2000) (citing *Humphrey,* 715 A.2d at 1273). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Humphrey,* 715 A.2d at 1273 (quoting *State v. Baton,* 488 A.2d 696, 701 (R.I.1985)).

At the conclusion of the evidentiary hearing, the trial justice ruled that the statements the defendant made while in his driveway and later in his home were admissible because they were given volun-

---

7. "A 'confession' is an individual's statement admitting all the elements of a crime. Distinct from a confession, an 'admission' is a statement admitting some facts relevant to proof of a crime but not the crime itself. In terms of admissibility, there is generally no difference between an admission and confession."

"Exculpatory statements are those that deny wrongdoing. Although treated differently from admissions or confessions at common law, because of their frequent contemporary use for impeachment constitutional doctrine treats exculpatory statements as admissions." Edward J. Imwinkelried et al., 2 *Courtroom Criminal Evidence* § 2302 (3d ed.1998).

Thus, although the defendant never actually confessed, the standard of review for confessions is applicable to his admissions and exculpatory statements.

tarily and at a time when he was not in custody. However, he suppressed all of the statements the defendant gave at the police station, finding that those statements were given involuntarily while he was in custody.

### (i) The Non–Police–Station Statements

The defendant appeals from the trial justice's denial of his motion to suppress the non-police-station statements. He contends that the trial justice erred in denying the motion because he made those statements while in a custodial setting and had not been given *Miranda* warnings. He asserts that because the police considered him a suspect from the moment that they first met him, he was in custody at that point and his constitutional rights were violated when the police proceeded to take his statements.

"A person is seized or under arrest for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave." *State v. Diaz*, 654 A.2d 1195, 1204 (R.I.1995) (citing *State v. Griffith*, 612 A.2d 21, 23 (R.I.1992)). "In making this determination, a court may consider the following factors: (1) the extent to which the person's freedom is curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police." *Diaz*, 654 A.2d at 1204 (citing *Griffith*, 612 A.2d at 23–24).

Applying these factors to the present case, the record reveals that the trial justice correctly determined that the defendant was not in custody when he first met and talked with the police at his house; consequently, he was not entitled to any *Miranda* warnings at that time. Although the police may have suspected the defendant of having murdered Mrs. Jacques when they encountered him at his home, "an investigating officer's unarticulated plan has no bearing on whether a person is in custody at a particular time." *Diaz*, 654 A.2d at 1204–05 (citing *Stansbury v. California*, 511 U.S. 318, 324, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 299 (1994) (per curiam)). "The lack of any communication concerning the murder investigation is crucial because the only relevant inquiry is how a reasonable person would have understood his or her situation." *Id.*

In denying the motion to suppress the non-police-station statements, the trial justice found that the defendant personally invited the police officers into his house, and he later voluntarily admitted that he owned a weapon and showed it to at least one officer. In addition, the trial justice found that the defendant had voluntarily offered to show the police his telephone caller I.D. box, and had willingly agreed to go to the police station with them to answer more questions. In view of these findings, we conclude that the trial justice did not err in denying the defendant's motion to suppress his non-police-station statements.

### (ii) The Police Station Statements

The state asserts on its part that the trial justice erred in suppressing the defendant's police station statements, contending that the defendant was not in custody when he gave his statements while at the New Hampshire State Police Headquarters. Second, it asserts that even if the defendant had been in custody, he gave those statements freely and voluntarily and after he was given his *Miranda* warnings.

In reviewing whether the defendant was in custody when he gave his statements while at the police station, the trial justice considered the length and duration of the questioning; the small size of the room in which the questioning took place; the fact that the defendant was never left alone and the fact that, other than on those few occasions when he used the bathroom, he did not leave the room. He found that

"[t]he questioning began harmlessly enough, but soon thereafter started to escalate in tone and aggressiveness and style * * * ." The trial justice found that although the defendant was read and understood his rights:

> "the defendant was cajoled, demeaned, threatened with prosecution for obstruction and child molestation. He was consistently called a liar. Impliedly, his job was threatened. He was yelled at, and on occasions, the Detectives swore at the defendant. The officers were persistent in their questioning of the defendant's sexual preference and his overall sex life."

After reviewing the totality of the circumstances the trial justice found that "the defendant was in custody during the course of thirteen hours of interrogation," and he concluded that "any and all statements made during that period of time were involuntarily promulgated, due to the fact that the conduct of the police was inherently coercive, impairing and depriving this defendant's right of freedom of choice."

"Having reviewed the trial justice's determination as to the historical facts relevant to the voluntariness of a confession, this Court undertakes a second analysis and exercises its independent judgment in determining whether those historical facts establish a deprivation of constitutional rights." *Humphrey*, 715 A.2d at 1274 (citing *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 411 (1985)).

 "Both the Rhode Island and the Federal Constitutions bar the use in a criminal trial of a defendant's involuntary statements." *Griffith*, 612 A.2d at 25 (citing *State v. Amado*, 424 A.2d 1057, 1061 (R.I.1981)). "A determination of voluntariness must be made on the basis of all facts and circumstances, including the behavior of the defendant and the behavior of the interrogators, and the ultimate test 'is whether the defendant's statements were the "product of his free and rational

choice" * * * or the result of coercion that had overcome the defendant's will at the time he confessed.' " *Id.* (quoting *Amado*, 424 A.2d at 1062). "A statement is involuntary if it is extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant." *Humphrey*, 715 A.2d at 1274 (citing *Griffith*, 612 A.2d at 25).

"However, while more subtle methods, though sometimes harder to perceive, are equally to be condemned when they trammel on the rights of those in custody * * * it may take a discerning eye to tell those that are fundamentally unfair from those which are no more than permissible instances in which the police have played the role of a 'midwife to a declaration naturally born of remorse or relief, or desperation, or calculation.' " *People v. Tarsia*, 50 N.Y.2d 1, 427 N.Y.S.2d 944, 405 N.E.2d 188, 192 (N.Y.1980) (citing *Culombe v. Connecticut*, 367 U.S. 568, 576, 81 S.Ct. 1860, 1864, 6 L.Ed.2d 1037, 1043 (1961)). " 'The mere fact that that admissions are made by an accused after a long period of interrogation by a police officer does not necessarily mean those admissions are involuntary.' " *State v. Lapointe*, 237 Conn. 694, 678 A.2d 942, 961–62 (1996). *See also People v. Croney*, 121 A.D.2d 558, 503 N.Y.S.2d 608, 609 (N.Y.App.Div.1986) (determining that, although not inconsequential, the voluntariness of an interrogation that lasted almost twelve hours "d[id] not, without more, render the confession defectively obtained").

 In the present case, after reviewing the record and after carefully listening to the recorded tapes, we cannot say that the trial justice clearly was wrong when he determined that the defendant was in custody at the time that he gave his statements at the police station. However, after applying the law to the historical facts found by the trial justice, we conclude that the trial justice erred when he excluded *all* of the statements made by the defendant

at the police station. The record reveals that the defendant properly was informed of his rights under *Miranda*, that he fully understood his rights, and that he executed a voluntary and intelligent written waiver of those rights. The record additionally reveals, as the trial justice correctly noted, that the police did question the defendant for almost thirteen hours and that the questioning does appear to have escalated "in tone and aggressiveness and style." As the recorded tapes disclose, on several occasions, the defendant also informed the officers that he was tired, but nevertheless, they continued to question him.

■ Those factors alone, while not to be condoned, do not serve to automatically overcome the voluntariness of the defendant's statements. However, when, in response to a question the defendant informed the officers that "I'm so tired now, I can't really think," and, when the officers thereafter escalated the tone of their questioning and began to ask increasingly sexually explicit questions of little or no relevance, they then overstepped the defendant's constitutional barrier and stepped over the line of propriety. From that point on, his answers no longer were voluntary. We conclude that the trial justice erred when he proceeded to exclude the defendant's *entire* statement given at the police station. We discern that the defendant's statements before question

1261, page 186, clearly were voluntary. Because those statements were untainted by the officers' later improprieties, they should not have been suppressed, and the trial justice clearly erred in doing so. While a baby's bath water may get dirty, that fact alone does not justify throwing out the baby with the dirty water.

### 2. The Trash Bag

#### (a) Choice of Law

■ The defendant also asserts that the trial justice improperly applied Rhode Island law in determining the admissibility of the evidentiary contents of the trash bag. He asserts that New Hampshire has a greater interest than Rhode Island in the application of its law to this issue. He contends that under New Hampshire law, he has automatic standing to challenge the seizure,[8] and that New Hampshire law provides him with greater protections while placing a heavier burden of proof on the actions of the state. He then asserts that the New Hampshire case of *State v. Westover*, 140 N.H. 375, 666 A.2d 1344 (1995) controls the outcome of this case.[9]

■ In resolving conflict-of-laws issues, this jurisdiction has adopted the " 'interest-weighing approach' " and employs five guidelines in making such determinations. *Victoria v. Smythe*, 703 A.2d 619, 620 (R.I.1997) (per curiam). Those guide-

---

8. The defendant cites to *State v. Sidebotham*, 124 N.H. 682, 474 A.2d 1377, 1379 (1984) for support of this proposition. However, that case appears to require only "that 'automatic standing' be afforded to all persons within the State who are charged with crimes in which possession of an article or thing is an *element*." *Id.* (Emphasis added.) For purposes of a Fourth Amendment challenge and assuming that the defendant still "possessed" the trash bag after it was thrown into the dumpster, its contents certainly did not constitute an element of the crime of murder; consequently, the New Hampshire "automatic standing" doctrine does not appear to be available to the defendant.

9. In *State v. Westover*, 140 N.H. 375, 666 A.2d 1344, 1348 (1995), the New Hampshire Supreme Court stated that "[w]hen a person abandons a possession * * * he or she gives up the right to be secure from unreasonable searches of that possession" and that a finding of abandonment is " 'a question of fact based upon evidence of a combination of act and intent.' " In addition to a subjective determination of intent, the New Hampshire Court stated that "[a]lso relevant to a determination of abandonment are 'where and for what length of time the property is relinquished and the condition of the property.' " *Id.* (quoting *O'Shaughnessy v. State*, 420 So.2d 377, 379 (Fla.Dist.Ct.App.1982)). However, because we conclude that Rhode Island law applies in determining the admissibility of the contents of the trash bag, we need not conduct a *Westover* analysis.

lines are: "(1) [p]redictability of results[,] (2)[m]aintenance of interstate and international order[,] (3)[s]implification of the judicial task[,] (4) advance of the forum's governmental interest[, and] (5)[a]pplication of the better rule of law." *Id.* at 620–21 (quoting *Woodward v. Stewart,* 104 R.I. 290, 300, 243 A.2d 917, 923 (1968)).

At the suppression hearing, the trial justice conducted an interest-weighing analysis to determine which jurisdiction's law applied to the defendant's motion to suppress the contents of the trash bag. In concluding that Rhode Island law was applicable, the trial justice adopted the findings that he had made earlier when ruling on the defendant's motion to suppress the statements the defendant made to the state police detectives. There he found:

"one, that the place of the injury, that is to say, the murder of Patricia Jacques, took place in Rhode Island and was allegedly committed by this defendant; two, that Mrs. Jacques was a resident of the State of Rhode Island, residing in Tiverton; three, that the trial of this case will be held within the jurisdiction of Rhode Island; four, that Chester Briggs, the defendant,. had at least a friendly relationship with the victim, Patricia Jacques, in the State of Rhode Island; five, that the State of Rhode Island has an interest in apprehending those who commit crimes within its borders and prosecuting those accused according to its laws; six, that many of the State's witnesses, such as police, medical examiner and various others either reside or are employed, or at the least were here when this homicide took place."

It is clear to us that the trial justice carefully analyzed the record evidence before him in finding that Rhode Island had the most significant interest in the outcome of this case. In viewing this analysis in light of the guidelines employed in *Victoria,* we conclude that the trial justice did not err when he applied Rhode Island law in ruling upon the constitutional validity of the police seizure of the trash bag.

**(b) Suppression of the Trash Bag**

The record reveals what we conclude to be the relevant facts concerning the trial justice's decision on the defendant's motion to suppress the evidence found in the trash bag. The defendant owned at least four residential properties in New Hampshire: his. home in Chichester, the neighboring house where Courtemanche lived, and two properties in Pittsfield, a town located about fifteen miles from Chichester. One of the Pittsfield properties was a multidwelling tenement that had a communal dumpster in its parking lot. The defendant rented the dumpster from a private company for use by his tenants. At least two other people, namely, the defendant and Courtemanche, also used the communal dumpster. They did so because the Town of Chichester did not have a municipal garbage pickup service and they had to make arrangements for the disposal of their own trash.[10]

The defendant and Courtemanche both placed their trash in a communal trash can in the defendant's barn in Chichester. They mutually agreed that whenever one of them would travel to Pittsfield, that person would dispose of all their accumulated trash into the communal dumpster at the multidwelling tenement. Such accumulated trash included any overflow trash that the defendant may have placed in the bed of his pickup truck. The defendant permitted Courtemanche to use his pickup truck when he was not using it, and facilitated this use by leaving the keys to the pickup truck either in the ignition or in the ashtray. Courtemanche used the defendant's truck to run errands and to dispose of trash into the defendant's dumpster.

10. The trash disposal arrangements for the defendant's other Pittsfield tenants was not in evidence.

On February 21, 1997, Courtemanche took the defendant's pickup truck to Pittsfield to run some errands. After discovering a trash bag in the bed of the pickup truck, Courtemanche drove to the defendant's tenement property and threw the bag into the communal dumpster. The police, who had been following Courtemanche, then seized the trash bag from the dumpster.

The defendant, in seeking to suppress the admission of the trash bag and its contents, asserted that the police seized the evidence in violation of his Fourth Amendment protections. After an evidentiary hearing, the trial justice granted that motion. The state appeals.

The state contends that the trial justice erred in suppressing the trash bag evidence. It asserts that because the defendant had abandoned the trash bag property, he retained no standing to challenge its taking and search by the police. In addition, the state avers that when the defendant left the trash bag contents out for disposal, he gave up any and all reasonable expectation of privacy in the trash bag or its contents. Many persons had ready access to the dumpster, and Courtemanche, as well as the defendant's other tenants, had ready access to the trash bag and its contents in an open and unlocked dumpster some fifteen miles from where the trash originated and had been discarded.

"Upon review of a trial justice's decision on a motion to suppress, deference is given to the findings of the trial justice, and those findings shall not be disturbed unless they are clearly erroneous." *State v. Ortiz*, 609 A.2d 921, 925 (R.I.1992) (citing *In re Kean*, 520 A.2d 1271, 1276 (R.I.1987); *In re John*, 463 A.2d 174, 176 (R.I.1983)). We have stated previously that:

> "The proponent of a motion to suppress has the burden of establishing that the challenged seizure violated his own Fourth Amendment rights. * * * It is not enough for a defendant seeking to suppress evidence to show that a Fourth

Amendment violation has occurred, rather some personal infringement must be established. * * * To determine whether a defendant should be allowed to assert infringement of his Fourth Amendment rights, we examine whether the individual had a legitimate expectation that those rights would be safeguarded." *State v. Wright*, 558 A.2d 946, 948 (R.I.1989).

In Rhode Island, "we employ a two-step process to determine from the record 'whether a legitimate expectation of privacy sufficient to invoke Fourth Amendment protection exists.' " *State v. Jimenez*, 729 A.2d 693, 696 (R.I.1999) (per curiam) (quoting *Wright*, 558 A.2d at 948). "First we determine whether the defendant 'exhibited an actual (subjective) expectation of privacy' and if that expectation is established, then we consider 'whether, viewed objectively,' the defendant's expectation was reasonable under the circumstances." *Id.* (quoting *Wright*, 558 A.2d at 948–49). "Usually, the second part of the test, i.e., whether the asserted expectation of privacy was objectively reasonable, is the most disputed." *Commonwealth v. Krisco Corp.*, 421 Mass. 37, 653 N.E.2d 579, 582 (1995). "This element is highly dependent on the particular facts involved and is determined by examining the circumstances of the case in light of several factors." *Id.* The relevant factors that are considered include:

> "possession or ownership of the area searched or property seized, prior use of the area searched or property seized, the ability to control or exclude others' use of the property, and legitimate presence in the area searched." *Wright*, 558 A.2d at 949.

This Court previously has not addressed the issue of a warrantless search and seizure of garbage; thus, we will look to other jurisdictions for guidance.

"Whether a warrantless search and seizure of garbage is constitutionally reasonable depends on whether the defendant

had a legitimate expectation of privacy in the garbage." *State v. Yakes,* 226 Wis.2d 425, 595 N.W.2d 108, 110 (1999) (citing *Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988)). "In garbage cases, Fourth Amendment reasonableness turns on public accessibility to the trash." *United States v. Long,* 176 F.3d 1304, 1308 (10th Cir.), *cert. denied*— U.S. ——, 120 S.Ct. 283, 145 L.Ed.2d 237 (1999) (citing *Greenwood,* 486 U.S. at 41, 108 S.Ct. at 1629, 100 L.Ed.2d at 37).

"[W]hether the Fourth Amendment's protections are invoked to protect the sanctity of the home or of commercial property, the touchstone of the inquiry into the objective reasonableness of an expectation of privacy is whether the governmental intrusion infringes upon the personal and societal values the Fourth Amendment protects." *United States v. Hall,* 47 F.3d 1091, 1094 (11th Cir.), *cert. denied* 516 U.S. 816, 116 S.Ct. 71, 133 L.Ed.2d 31 (1995) (citing *Oliver v. United States,* 466 U.S. 170, 182–83, 104 S.Ct. 1735, 1743–44, 80 L.Ed.2d 214, 227 (1984)). *See also Yakes,* 595 N.W.2d at 110 (stating that "[w]hile both residential and commercial property are protected from unreasonable searches and seizures by the Fourth Amendment * * * the factors probative of an objectively reasonable privacy expectation differ depending on the nature of the property").

"The fact that the test of the legitimacy of an expectation is the same in both the residential and commercial sphere does not mean, however, that the factors which tend to be of probative value in resolving the inquiry when the governmental intrusion involves a residence, are to be accorded the same weight when the inquiry is directed at the legitimacy of a privacy expectation in commercial property." *Hall,* 47 F.3d at 1095. "In order for persons to preserve Fourth Amendment protection in the area immediately surrounding [their] residence, they must not conduct an activity or leave an object in the plain view of those outside the area." *Id.* (citing *United States v. Dunn,* 480 U.S. 294, 316, 107 S.Ct. 1134, 1147, 94 L.Ed.2d 326, 344–45 (1987) (Brennan, J., dissenting)). "The occupant of a commercial building, in contrast, must take the additional precaution of affirmatively barring the public from the area." *Hall,* 47 F.3d at 1095. *See also Yakes,* 595 N.W.2d at 111 (concluding that " 'the owner of commercial property has a reasonable expectation of privacy in those areas immediately surrounding the property only if *affirmative steps* have been taken to exclude the public.' ") (Emphasis added.) In the commercial context, the "failure to exclude the public takes on increased significance when the asserted expectation of privacy is in discarded garbage." *Hall,* 47 F.3d at 1096. The reason for this is because "[s]ociety does not recognize a reasonable expectation of privacy in 'trash left for collection in an area accessible to the public.' " *Long,* 176 F.3d at 1308.

An instructive case in the context of the search and seizure of residential garbage is *United States v. Redmon,* 138 F.3d 1109 (7th Cir.1998), *cert. denied* 525 U.S. 1066, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999). There, the defendant lived in a townhouse with an attached garage, and he shared a common driveway with his neighbor. A municipal ordinance prohibited residents from placing garbage on the curbside for collection, so the defendant customarily placed his garbage cans outside his garage on the common driveway. Finding that the defendant did not have an objectively reasonable expectation of privacy in his garbage cans, the Seventh Circuit Court of Appeals stated that:

"[t]he paths to the front doors passing near the garbage cans without any obstruction were open to use by friends and guests of himself and his neighbors, as well as solicitors, strangers, postal people, and a myriad of others including animals, and even snoops * * *." *Redmon,* 138 F.3d at 1114.

In the present case, the trial justice relied upon *People v. Edwards*, 71 Cal.2d 1096, 80 Cal.Rptr. 633, 458 P.2d 713 (1969), to find that the defendant had a reasonable expectation of privacy in the seized trash bag. That reliance was misplaced. Assuming, without deciding, that the defendant even had standing to challenge the search and seizure of the trash bag in the first instance, we conclude that he did not have an objectively reasonable expectation of privacy in its contents.

In *Edwards*, the police searched a trash can that was located only a few feet from the back door of the defendant's home. *Edwards*, 80 Cal.Rptr. 633, 458 P.2d at 718. The contents of the trash can were "not visible without 'rummaging' in the receptacle." *Id.* The defendants were the sole residents of the property. *Id.* After reviewing these particular facts and circumstances, the California Supreme Court concluded that the defendants exhibited an expectation of privacy that was reasonable. *Id. Edwards* is readily distinguishable from the present case.

In this case, the trash bag was thrown into a communal dumpster in the parking lot of a multidwelling tenement about fifteen miles from the defendant's residence. The defendant had a specific arrangement with Courtemanche concerning the disposal of each other's trash. The defendant specifically knew that if he placed trash in the bed of his pickup truck, Courtemanche, in accordance with their agreement, probably would throw the trash into the unlocked and open communal dumpster in Pittsfield, where it would be available to anyone curious enough to look into the dumpster and to take the bag for whatever reason they might have for doing so. Nevertheless, notwithstanding this knowledge, the defendant, placed the contested trash bag into the bed of his pickup truck. In doing so, he effectively abandoned his subjective expectation of privacy, and any expectation of privacy that later he asserted was objectively unreasonable.[11]

Even if the defendant had retained a subjective expectation of privacy while the trash bag remained in the bed of the pickup truck, that expectation became unreasonable after Courtemanche threw it into the communal dumpster.[12] The record indicates that defendant was the absentee landlord of the multidwelling property in Pittsfield, where the dumpster was located. Assuming that this does not require him to "take the additional precaution of affirmatively barring the public from the area" in order to preserve his Fourth Amendment protection, *Hall*, 47 F.3d at 1095, the fact that so many people had access to the dumpster dissipates any expectation of privacy that he may have had before the trash bag was dumped. Such people in-

---

11. "The issue in all abandonment cases is whether the accused has relinquished his reasonable expectation of privacy in the property by his conduct and not whether he has abandoned property in the property law sense." John Wesley Hall, Jr., 1 *Search and Seizure* § 13.3 (3d ed.2000).

"The distinction between abandonment in the property-law sense and abandonment in the constitutional sense is critical to a proper analysis of the issue. In the law of property, the question * * * is whether the owner has voluntarily, intentionally, and unconditionally relinquished his interest in the property so that another, having acquired possession, may successfully assert his superior interest. * * * In the law of search and seizure, however, the question is whether the defendant has, in discarding the property, relinquished his reasonable expectation of privacy so that its seizure and search is reasonable within the limits of the Fourth Amendment. * * * In essence, what is abandoned is not necessarily the defendant's property, but his reasonable expectation of privacy therein." *Id.* at 732 n. 32 (citing *City of St. Paul v. Vaughn*, 306 Minn. 337, 237 N.W.2d 365, 370–71 (1975)).

12. We note here that, there is no evidence of any state action until the police removed the trash bag from the communal dumpster. *See State v. Guido*, 698 A.2d 729, 733 (R.I.1997) (acknowledging that "[t]he Fourth Amendment exclusionary rule is 'based upon the deterrence of illegal police or prosecutorial actions, [and] it is not triggered by the actions of private persons however egregious they may be,'" quoting *State v. Pailon*, 590 A.2d 858, 861 (R.I.1991)).

cluded the tenants in the property, as well as the tenants' guests, solicitors, strangers, postal people, animals; indeed, on at least three occasions, even the police had access to the property.[13] *See Redmon,* 138 F.3d at 1114; *see also Long,* 176 F.3d at 1308. In addition, the private company that collected the trash also had access to the communal dumpster. Consequently, we conclude that the defendant had no objectively reasonable expectation of privacy in the disputed and disposed of trash bag, and that the trial justice erred in suppressing its contents.

For all the foregoing reasons, the state's appeal is sustained in part and denied in part. Its appeal from the trial justice's order as it concerns suppression of that portion of the defendant's February 21–22, 1997, statement given while at the New Hampshire State Police Headquarters, beginning with questions and answers Nos. 1 through 1260, is sustained. Its appeal from the trial justice's order as it concerns suppression of all questions and answers noted after question 1260 contained in the defendant's statement is denied.

The state's appeal from the trial justice's order suppressing admission of the trash bag and its contents is sustained.

The defendant's appeal from the trial justice's order denying his motion to suppress the statements he made to the Rhode Island State Police at his home at 111 Kaime Road in Chichester, New Hampshire, on February 21, 1997, and his request that all of his motions to suppress be decided in accordance with applicable New Hampshire law are denied.

The papers in this case are remanded to the Superior Court for further proceedings in accordance with this opinion.

---

13. On February 16, 1997, the Pittsfield, New Hampshire, police responded to three separate complaints concerning apartment No. 6, located in the defendant's tenement building served by the dumpster in question. The first was a noise complaint, and was made by the occupant of apartment No. 4. The second and third complaints involved two domestic dispute incidents between a tenant of the defendant and that tenant's visiting boyfriend.