STATE

v.

David VIEIRA.

No. 2005–248 C.A.

Supreme Court of Rhode Island.

Jan. 16, 2007.

Virginia M. McGinn, Esq., Providence, for Plaintiff.

Janice M. Weisfeld, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

### OPINION

Justice ROBINSON for the Court.

The defendant, David Vieira, appeals to this Court from a judgment of conviction after a jury found him guilty of four counts of first-degree sexual assault, two counts of second-degree sexual assault, and three counts of breaking and entering. The defendant was sentenced to two consecutive life sentences on two of the counts of first-degree sexual assault and to concurrent

terms of forty years on the remaining charges.

On appeal, defendant contends that the trial justice erred in denying his motions to suppress his statement to the police and certain tangible evidence seized from him at the police station. The defendant asserts that his statement and the tangible evidence should have been suppressed since they were the fruit of what defendant contends was an unlawful arrest.

For the reasons set forth in this opinion, we affirm the judgment of conviction.

### Facts and Travel[1]

At approximately 5 p.m. on December 28, 2002, Jane Smith[2] heard a knock on the door of her apartment in the Centennial Towers in Pawtucket. She opened the door a few inches and saw a man whom she did not recognize and who was asking to speak with her. Ms. Smith told the man (whom she later identified as defendant) that she did not think she knew who he was, and she attempted to close the door. However, defendant used his hand to prevent the door from closing, and he proceeded to force his way into the apartment. When Ms. Smith began to scream, defendant grabbed her by the neck and pushed her into the living room and onto the floor, where he positioned himself on top of her and told her that he wanted "to make love" with her. Ms. Smith testified that she was very frightened and told defendant "no," but that she eventually submitted to his request because defendant told her that he would leave if she did submit and Ms. Smith felt it was her "only way out."

Ms. Smith testified that defendant managed to put his penis in her vagina but had difficulty maintaining an erection. He next put his mouth on her vagina and then placed his penis in her mouth. Ms. Smith testified that defendant was becoming agitated, which caused her to fear that he might strike her. At that point, Ms. Smith tried to stand up, whereupon defendant pushed her into the bedroom. Once in the bedroom, defendant once again unsuccessfully attempted to engage in vaginal intercourse, and he then unsuccessfully attempted to engage in anal intercourse. She further testified that, when she resisted these sexual batteries, he told her, "I'm in charge here." At that point, Ms. Smith offered to give defendant money if he would leave. She gave defendant fifteen dollars from her purse, but defendant indicated that that was not enough money, and he left the room in search of more. Ms. Smith took that opportunity to run out of the apartment and into a neighbor's apartment, where she asked her neighbor to call the police.[3] Ms. Smith identified defendant as her attacker a couple of days after the incident from a photo array shown to her by the police.

At approximately 6 p.m. that same evening, Sally Jones was visiting the apartment of a friend of hers in the building in which they both lived at 8 George Street in Pawtucket.[4] Shortly after arriving at that

---

1. We set forth in this section the most significant facts adduced at trial.

2. Throughout this opinion, the complainants will be referred to pseudonymously in order to protect their privacy.

3. One of Ms. Smith's neighbors testified at trial that, at approximately 5:30 p.m. on December 28, 2002, he heard cries for help and that Ms. Smith then arrived at his apartment and informed him that she had just been raped. He further testified that he then called 911. A tape recording of that call was admitted into evidence at trial.

4. The building in which Ms. Jones resided was located approximately three-quarters of a mile from the Centennial Towers building in which Ms. Smith resided.

apartment, her friend asked her if she had heard a noise. Although she had not heard anything, Ms. Jones glanced at the door and noticed a shadow, which was perceptible because of a gap under the door. She then walked across the room to the door. As she reached the door, which had been closed and locked after she arrived at the apartment, she saw that it had been opened and a man was standing in the apartment. She asked him, "Who are you? What do you want?" When Ms. Jones's friend asked her from the other room what was happening, the intruder took a step back, and Ms. Jones managed to slam the door shut and lock it.

At that point, Ms. Jones went to the telephone and called 911. As she was speaking with the 911 operator, Ms. Jones looked through the peephole in the door and observed the same man approach another apartment and attempt to enter it. When he did not succeed in gaining entry to that apartment, the man turned and walked around the corner, where Ms. Jones could no longer see him. Shortly thereafter, Ms. Jones, who was still on the telephone with the 911 operator, heard a woman screaming. A few days after the incident, two Pawtucket police detectives showed Ms. Jones a photo array from which she identified defendant as the intruder of December 28, 2002. She also identified him at trial.

Judith Wilson also lived in the apartment building at 8 George Street in Pawtucket. On the evening of December 28, 2002, she was in her apartment getting ready for a party which her son was hosting at his home. When she opened the door of her apartment to leave for the party, she saw a man standing at her door. Ms. Wilson asked the man who he was, and she bluntly told him: "Go away." The man did not say anything in response; instead, he pushed her into the apartment,

struck her on the chest and face, and then pulled her into the bedroom. Ms. Wilson screamed as the man dragged her into the bedroom.

Once in the bedroom, the man told Ms. Wilson that he wanted to have sex with her, and he pushed her onto the bed. He then struck her on the head again and threatened to kill her if she did not cooperate. After hearing that threat, Ms. Wilson stopped screaming, and the assailant proceeded to engage in vaginal intercourse with her. He then allowed Ms. Wilson to get some ice to put on her face where he had struck her. When she went into the kitchen to get the ice, Ms. Wilson picked up the telephone, but her attacker came in and took the phone out of her hand. At that point, Ms. Wilson ran out of the apartment. Ms. Wilson, like Ms. Smith, identified defendant as her attacker from a photo array shown to her by the police a few days after the attack. At trial, she again identified defendant as having been her attacker, and she also identified a jacket belonging to defendant that he had left on the floor of her bedroom on the night of the attack.

On July 3, 2003, defendant was charged by indictment with six counts of first-degree sexual assault involving two complainants as well as four counts of burglary and larceny. A hearing on pretrial matters, including defendant's motion to suppress his police statement and certain tangible evidence, began on November 29, 2004. With respect to his motion to suppress, it was defendant's contention that his police statement as well as a blood sample and articles of clothing that were seized from him at the police station were the fruits of an illegal arrest and were therefore not admissible. In support of that claim, defendant argued that he was under arrest from the point in time when he agreed to accompany the police from his home to the

police station. The defendant contended that, since the police did not have probable cause to arrest him at that time, the evidence seized from him at the police station constituted fruit of the poisonous tree.

Detective Gary Grenier of the Pawtucket Police Department testified at the hearing on defendant's motion to suppress. According to Detective Grenier, in the early evening hours of December 28, 2002, he was called to the scene of an alleged sexual assault that had been reported at Centennial Towers in Pawtucket. On his way there, however, his attention was directed to another reported sexual assault, which was said to be in progress at that time in an apartment building located at 8 George Street, an address near Centennial Towers. Detective Grenier made the assumption, due to the closeness in time of the two alleged assaults and the proximity of the two buildings, that the incidents might involve the same perpetrator. Consequently, Detective Grenier proceeded to 8 George Street and arrived there in less than one minute.

Upon arriving at 8 George Street, Detective Grenier spoke with Judith Wilson, and she provided him with a description of the person who she said had assaulted her. Armed with that description, Detective Grenier and the other Pawtucket police officers who had arrived at the scene attempted to locate the suspect, but they were unsuccessful. Detective Grenier testified that he then traveled to Memorial Hospital in Pawtucket in order to speak with Jane Smith, who had been taken there after the alleged sexual assault on her. As had Ms. Wilson, Ms. Smith provided a description of her attacker to Detective Grenier.

On December 30, 2002, Detective Grenier obtained videotapes from surveillance cameras that had been operating on December 28 at the two buildings in which the assaults occurred. Detective Grenier and another detective from the Pawtucket Police Department reviewed the videotapes and determined that a particular person pictured on the videotapes matched the description given by the victims. In addition, the person in the videotape was wearing a baseball cap with a distinctive "D" on it, which resembled a baseball cap that had been left in Ms. Smith's apartment by her assailant.

The detectives generated still prints from several frames of the video in which the suspect was pictured, and they then distributed the prints to patrol officers, who proceeded to question customers and proprietors of bars close to Centennial Towers as to whether they could identify anyone in the pictures. According to Detective Grenier, the owner of Charlie's Tavern, one Marcelino Barbosa, recognized the man in the pictures as David Vieira, and he indicated that Mr. Vieira had been in the bar late in the afternoon of December 28, 2002 and was at that time wearing a hat with the letter "D" on it.

Detective Grenier testified that, by entering the name "David Vieira" into the police computer system, he obtained a photograph that was similar to the photographs of the suspect that had been generated from the surveillance videotapes. The computer also produced David Vieira's address. Detective Grenier, along with another detective and an officer from the Pawtucket Police Department, then went to defendant's home on the morning of December 31, 2002.

When the police arrived at defendant's home, they knocked on the door, and it was answered by a man who identified himself as being Mr. Vieira's brother. They told the brother that they wanted to speak to Mr. Vieira regarding an incident that had occurred the previous Saturday. The brother allowed the police to enter,

and he indicated that Mr. Vieira was sleeping in the basement. He then led the police down to the basement and woke up his brother.

When Mr. Vieira was awakened, Detective Grenier noticed that he was wearing red and blue plaid boxer shorts that matched the description given by Ms. Smith of what her attacker had been wearing. The officers identified themselves, and they asked Mr. Vieira whether he would accompany them to the Pawtucket Police Station because they needed to speak with him and ask him some questions about an incident that had occurred on the previous Saturday. Mr. Vieira agreed to accompany them to the police station, got dressed, and was transported to the police station; the trip lasted approximately two minutes. Mr. Vieira was not placed in handcuffs at his home or in the police car.

Detective Grenier testified that, once at the police station, Mr. Vieira's photograph was taken before he was brought to an interview room next to the detectives' office. Upon entering the interview room, which also contained a kitchenette, Detective Grenier and another detective offered Mr. Vieira water or coffee before they sat down to interview him. The detectives then read Mr. Vieira his *Miranda*[5] rights. Detective Grenier testified that they first went over the rights form in English. Then, in order to make certain that Mr. Vieira, who is of Cape Verdean descent, understood his rights, Detective Gonsalves reviewed the rights in Creole utilizing a Portuguese rights form.[6] According to both Detective Grenier and Detective Gonsalves (who also testified at the hearing on defendant's motion to suppress), Mr. Vieira appeared to be calm and coopera-

tive while he was being informed of his rights and while he was being questioned. Moreover, according to the detectives, he indicated that he understood his rights, and he expressed no reservations about speaking with the detectives.

After signing the waiver of rights form, defendant agreed to speak to the detectives. When the detectives confronted him with a photograph of the baseball cap that had been left at Ms. Smith's apartment and with the videotaped images from the surveillance cameras, defendant gave the incriminating statement that he later moved to suppress.

After hearing the testimony of witnesses and arguments of counsel, the trial justice denied defendant's motion to suppress, finding that the police officers had been given consent to enter defendant's home and that defendant had voluntarily accompanied them to the police station without being subjected to any coercion or force. The trial justice further determined that the police officers' actions at the police station, including their informing defendant of his *Miranda* rights, did not bespeak a custodial setting.

The case then proceeded to trial on December 1, 2004. When the state rested, it proceeded to (1) amend the burglary counts to breaking and entering; (2) dismiss the larceny count; and (3) reduce one of the six first-degree sexual assault counts to second-degree sexual assault.

On December 9, 2004, the jury found defendant guilty of four counts of first-degree sexual assault, two counts of second-degree sexual assault, and three counts of breaking and entering.

In March of 2005, defendant was sentenced to two consecutive terms of life imprisonment for the two counts of first-

---

**5.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** Detective Gonsalves is also of Cape Verdean descent and speaks Creole.

degree sexual assault and to concurrent terms of forty years on the remaining counts. The defendant filed a timely notice of appeal.

On appeal, defendant contends that the trial justice erred in denying his motions to suppress his statement to the police and the tangible evidence seized from him at the police station. In support of this contention, defendant argues that he was arrested without probable cause at the time when he was taken from his home to the Pawtucket Police Station and that the arrest was therefore unlawful. He further argues that the evidence seized from him at the police station was the fruit of that unlawful arrest.

The state counters that the trial justice's determination that defendant was not legally under arrest despite having been given *Miranda* warnings was fully supported by the record and that the denial of defendant's motion to suppress was not error. Because we agree that the trial justice's denial of defendant's motion to suppress was appropriate, we deny defendant's appeal and affirm the judgment of conviction.

### Standard of Review

■ This Court performs a two-step analysis when reviewing a trial justice's decision as to whether or not to grant a motion to suppress a confession. *State v. Humphrey*, 715 A.2d 1265, 1273 (R.I.1998); *see also State v. Briggs*, 756 A.2d 731, 736 (R.I.2000). We first review the trial justice's findings with respect to the historical facts pertaining to the voluntariness of the confession, and, in doing so, we accord deference to those findings. *Humphrey*, 715 A.2d at 1273; *see also Briggs*, 756 A.2d at 736. Next, we conduct a *de novo* review of the conclusions that the trial justice drew from those historical facts as to the voluntariness *vel non* of defendant's confession. *Humphrey*, 715 A.2d at 1273; *see*

*also Briggs*, 756 A.2d at 736. This Court will reverse a trial justice's determination on a motion to suppress only if "(1) his or her findings concerning the challenged statements reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." *State v. Garcia*, 743 A.2d 1038, 1044 (R.I.2000); *see also Briggs*, 756 A.2d at 736.

### Analysis

■ The defendant contends on appeal that he was actually arrested at the time the police took him from his home to the police station and that that arrest was unlawful because the police did not have probable cause to arrest him at that time. Consequently, defendant asserts, his confession to police and the tangible evidence obtained at the police station should have been suppressed as the fruit of an illegal arrest.

■ It is a fundamental principle that "[a] person is seized or under arrest for Fourth Amendment purposes if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave." *State v. Diaz*, 654 A.2d 1195, 1204 (R.I.1995); *see also Briggs*, 756 A.2d at 737. This Court has stated that the following four factors may be considered by trial courts making these determinations: "(1) the extent to which the person's freedom [was] curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police." *Diaz*, 654 A.2d at 1204; *see also Briggs*, 756 A.2d at 737.

In the instant case, the trial justice expressly considered each of these four factors in making his determination that defendant was not in custody at the time that

the police took him from his home to the police station. The trial justice first reviewed the facts surrounding the activity of the police at Mr. Vieira's home on December 31, 2002. Specifically, he found the following:

"[Mr.] Vieira's brother admitted the officers into the house. There's no issue raised that the police officer had no business being in that house. It seems to me the evidence clearly indicates it was a consensual entry. The defendant's brother woke him up. * * * [T]hey asked Mr. Vieira to accompany them to the station because they wanted to inquire of him about an incident that had occurred a couple of nights before on Saturday night. They never told him that it was sexual assault. * * * They asked him if he would assist them by coming to the station. He said he would. He was never told at the house that he was a target; never told he was a suspect at the house. The fact that the officers gave him a ride to the station is of no moment. They never displayed their weapons in an untoward fashion."

The trial justice then applied these facts to each of the four factors articulated in *Diaz*, 654 A.2d at 1204. He stated:

"I look at whether or not Mr. Vieira's freedom was curtailed. I don't think that he was somehow in a position to claim, as a reasonable, innocent person might, that he was not free to leave. * * * He was given a ride to the station; he agreed to go.

"I look at the next factor, whether there was any degree of force employed by the police. I find there was none.

"I look at three, again, the belief of a reasonable, innocent person in identical circumstances, and I am fully satisfied that a reasonable innocent person in identical circumstances would not find

themselves of a view that they had somehow been arrested under the circumstances presented in this case.

"Fourthly, whether the person had the option of accompanying or not accompanying the police * * * the officers have no obligation to so admonish the subject." (Paragraphing supplied.)

The trial justice further found that defendant was still not an arrestee during his conversation with the police at the police station. Specifically, he noted that

"[defendant] was never handcuffed; never locked in a cell. He was offered some refreshments, be it water or coffee. * * * [T]here is nothing in the record before me that would suggest in any way that Mr. Vieira was somehow suffering from any kind of physical or mental incapacity. Looking at the videotape it's clear throughout that he was sitting comfortably in his chair. He's not at all anxious. He does not appear even nervous. He seems calm and collected. * * * It was not a cellblock; it was simply a room with a table and chairs. * * * He is still not in custody or under arrest, in my view, according to the facts before me. * * * I'm saying that on the facts before me, a reasonable person under those circumstances would not perceive himself under arrest * * *."

We perceive no basis for concluding that the trial justice's findings of fact with respect to the events leading up to defendant's confession were clearly erroneous. To the contrary, our review of the record reveals that said findings were all well supported by competent evidence. It is also our opinion that the trial justice carefully applied each of the factors set forth in *Diaz*, 654 A.2d at 1204, to the facts of the instant case and, in doing so, correctly concluded that defendant was not in custody at the time when he was taken from his home to the police station.

Because we have decided that the defendant was not placed under arrest until after he gave his statement to the police, the defendant's contention that evidence obtained at the police station was the fruit of an unlawful arrest and should have been suppressed has ceased to be viable.

### Conclusion

For the foregoing reasons, we affirm the judgment of conviction. The record may be remanded to the Superior Court.